ENVIRONMENTAL DEFENSE FUND, INC., Pratt Remmel, Jr., and Mrs. Gale Eddins, Appellants,

v.

Martin R. HOFFMAN, Secretary of the Army, General Frederick B. Clarke, Chief of Engineers, Corps of Engineers of U. S. Army, and Cache River-Bayou DeView Improvement District, Appellees.

Arkansas Game and Fish Commission, Intervenor-Plaintiff.

John Getson, S. L. Simpson, Anderson Wells, F. D. Munger, Owen Burton, John Connor, Donald Cain and Raymond Carloch, Intervenor-Defendants.

ARKANSAS GAME AND FISH COMMISSION, Appellant,

v.

Martin R. HOFFMAN, Secretary of the Army, General Frederick B. Clarke, Chief of Engineers, Corps of Engineers of U. S. Army, Cache River-Bayou DeView Improvement District, John Getson, S. L. Simpson, Anderson Wells, F. D. Munger, Owen Burton, John Connor, Donald Cain, and Raymond Carloch, Appellees.

Nos. 76–1366, 76–1431.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1977.

Decided Oct. 25, 1977.

James T. B. Tripp, Environmental Defense Fund, New York City, for Environmental Defense Fund and Ark. Game and Fish Com'n; G. William Lavender, Texarkana, Ark., on the brief.

William G. Peterson, Sp. Asst. Atty. Gen., St. Paul, Minn., for State of Ark.

Glen R. Goodsell, Land and Natural Resources, Appellate Section, Dept. of Justice, Washington, D. C., for appellees; G. D. Walker, Jonesboro, Ark., on brief for appellees, Cache River-Bayou DeView Improvement Dist., John Getson and other intervening landowners; Peter R. Taft, Asst. Atty. Gen., Washington, D. C., W. H. Dillahunty, U. S. Atty., and Walter G. Riddick, Asst. U. S. Atty., Little Rock, Ark.; Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., Richard M. Adelman, Dist. Counsel, Corps of Engineers, Memphis, Tenn., Michael A. McCord, Atty., Dept. of Justice, Washington, D. C., on briefs, for federal appellees.

Bill Clinton, Atty. Gen., Little Rock, Ark., and William G. Peterson, Dept. of Natural Resources, St. Paul, Minn., filed amicus brief of State of Ark. in case no. 76–1366.

John C. Danforth, Atty. Gen., State of Mo., Cyril M. Hendricks, Atty., Dept. of Conservation, Jefferson City, Mo., Bronson C. La Follette, Atty. Gen., State of Wis., Theodore L. Priebe, Asst. Atty. Gen., Madison, Wis., Warren R. Spannaus, Atty. Gen., State of Minn., William G. Peterson, Sp. Asst. Atty. Gen., St. Paul, Minn., Richard C. Turner, Atty. Gen., State of Iowa, Clifford E. Peterson, Sp. Asst. Atty. Gen., Des Moines, Iowa, William J. Scott, Atty. Gen., State of Ill., Richard W. Cosby, Asst. Atty. Gen., Springfield, Ill., filed amicus briefs for the States of Minn., Ill., Mo., Wis. and Iowa in case no. 76–1431.

Before HEANEY and STEPHENSON, Circuit Judges, and STUART, District Judge.*

* WILLIAM C. STUART, United States District Judge, Southern District of Iowa, sitting by designation.

HEANEY, Circuit Judge.

The principal question raised on this appeal is whether the final revised environmental impact statement (EIS),[1] filed by the Corps of Engineers in conjunction with the Cache River-Bayou DeView Channelization Project, complies with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., (NEPA) and the mandate of this Court in Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346 (8th Cir. 1972). The trial court concluded that the EIS fully complied with NEPA and that the action of the Corps in deciding to proceed as proposed in the EIS was not arbitrary and capricious. Accordingly, the trial court vacated an injunction it had previously issued restraining any construction on the project and dismissed the complaint. We affirm.

I

This is the second time the Cache River Project has been before this Court. The project involves clearing, realigning, enlarging and rechanneling, for flood control and drainage purposes, over two hundred and thirty-one miles of the Cache River, its upper tributaries and its principal tributary— the Bayou DeView. This public works project is presently estimated to cost the federal government over ninety-three million dollars.[2] The lengthy history of the project, which was first authorized twenty-seven years ago,[3] was outlined by this Court in Environmental Defense Fund, Inc. v. Froehlke, supra at 348. In that case, this Court reviewed the first EIS filed by the Corps in connection with the project and found it to be in violation of NEPA, the guidelines adopted by the Council on Envi-

ronmental Quality (CEQ) and the regulations of the Corps itself. The Corps was ordered to submit a revised EIS and the trial court was ordered to grant appropriate injunctive relief. Id. at 356. On March 16, 1973, the trial court issued an injunction restraining any further construction pending the preparation of a revised EIS by the Corps. About four miles of the project had been completed at the time the injunction was filed.

Congress authorized a modification of the project in the Water Resources Development Act of 1974, Pub.L.No.93–251, § 99, 88 Stat. 41 (1974), in accordance with the Report of the Chief of Engineers, Department of the Army, Modification of Cache River Basin Feature, Mississippi River and Tributaries Project, Arkansas, H.Doc.No. 92–366, 92d Cong., 2d Sess. (1972). The Act authorized acquisition by fee or easement of not more than seventy thousand acres of Cache River Basin bottomlands to mitigate fish and wildlife resource losses as a result of the project. At least thirty thousand acres of the mitigation lands are to be available for public use. Federal expenditure for the mitigation lands is not to exceed seven million dollars. The Act further provides that "[n]o less than 20 per centum of the funds appropriated each fiscal year for the Cache River project shall be appropriated to implement mitigation until the full mitigation amount has been appropriated."

On November 8, 1974, the Corps filed a final revised EIS, which consisted of six volumes including appendices, with the CEQ and the trial court. Soon thereafter, the federal defendants filed a motion to dissolve the injunction and dismiss the complaint. They later also filed a motion for

1. The draft of the revised environmental impact statement (EIS) was filed by the Corps of Engineers with the Council on Environmental Quality (CEQ) on December 17, 1973. The final revised EIS was filed by the Corps with the CEQ on November 8, 1974.

2. *Public Works for Water and Power Development and Energy Research Appropriation Bill, 1978: Hearings before a Subcomm. of the Comm. on Appropriations House of Representatives*, 95th Cong., 1st Sess. 12 (1977) [hereinafter cited as *Public Works*]. When this Court

reviewed the first EIS filed by the Corps, it was estimated that the project would cost the federal government forty-three million dollars. *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 348 (8th Cir. 1972).

3. The project was authorized by the Flood Control Act of 1950, 64 Stat. 172, in accordance with the Report of the Chief of Engineers, United States Army, Cache River Basin, Arkansas and Missouri. S.Doc.No.88, 81st Cong., 1st Sess. (1949).

summary judgment. The trial court denied these motions and directed the parties to proceed with discovery. In November, 1975, the trial court held an extensive four-day hearing on the merits of the revised EIS at which more than twenty persons testified and numerous exhibits were presented. Briefs were filed by the plaintiffs,[4] the federal defendants,[5] the intervenors[6] and the amicus curiae.[7] On March 22, 1976, the trial court filed its memorandum opinion discussing each of the issues raised by the plaintiffs with respect to the adequacy of the final revised EIS. It concluded that the revised EIS satisfied the requirements of NEPA, the guidelines of the CEQ and the regulations of the Corps; that the revised EIS formed an adequate basis on which the decision to proceed with the project could be made; and that the decision to proceed itself was not arbitrary and capricious. It then vacated the injunction it had previously issued restraining any construction on the project and dismissed the complaint. This appeal followed. Since the filing of this appeal, several events of significance to the issues raised have occurred.

On November 26, 1976, a contract was awarded for construction on the next upstream segment of three and one-tenth miles. On March 21, 1977, this Court refused to enjoin construction of this segment pending appeal. Construction is presently underway on the three and one-tenth-mile segment which is expected to be completed by the end of November, 1977.

Approximately one hundred and twenty acres of mitigation land has been purchased. Over fifteen thousand acres of mitigation land are scheduled for acquisition by mid-1978, subject to the availability of funds.

On February 21, 1977, President Carter announced a major review of all water resource projects in connection with the budget for fiscal year 1978. *Water Resource Projects: The President's Message to Congress Recommending Deletion of Funds for 19 Projects from the 1978 Fiscal Year Budget,* 13 Weekly Comp. of Pres.Doc. 234 (February 21, 1977). The Cache River Project was one of nineteen major water resource projects which were initially identified as unsupportable on "economic, environmental, and/or safety grounds." The President instructed the Secretaries of the Interior, the Army and of Agriculture to work with the CEQ and the Office of Management and Budget in carrying out a complete evaluation of each of the nineteen water resource projects questioned by the President. Representatives from each agency initially screened the projects and it was determined that the Cache River

4. The original plaintiffs in this action were the Environmental Defense Fund, Inc., the Arkansas Wildlife Federation, the Arkansas Ecology Center, the American Duck Hunters Association, Pratt Remmel, Jr., and Mrs. Gale Eddins. The trial court dismissed the Arkansas Wildlife Federation, the Arkansas Ecology Center and the American Duck Hunters Association. Gale Stewart, formerly Eddins, was permitted to withdraw as a party appellant by this Court.

5. The original federal defendants were Robert F. Froehlke, Secretary of the Army, General Frederick B. Clarke, Chief of Engineers of the United States Army, and the Corps of Engineers of the United States Army. The trial court dismissed the Corps of Engineers. Both Froehlke and Clarke have since been replaced as parties. Martin R. Hoffman, the present Secretary of the Army, and Lieutenant General William C. Gribble, Jr., the present Chief of Engineers, are now the named federal parties to the action.

6. The Arkansas Game and Fish Commission was permitted to intervene on behalf of the plaintiffs. The Cache River-Bayou DeView Improvement District and several landowners were permitted to intervene on behalf of the defendants. Only the defendant-intervenors submitted a post-hearing brief to the trial court. They have also filed briefs with this Court.

7. Several states in the Mississippi Flyway, the range of mallards, wood ducks and other migratory waterfowl, filed motions to appear as amicus curiae. Motions were filed by Minnesota, Iowa, Illinois, Ohio, South Dakota, North Dakota and Wisconsin. A motion to appear as amicus curiae was also filed by the Kentucky Department of Fish and Wildlife Resources. The State of Minnesota filed a post-hearing brief with the trial court. The States of Minnesota, Illinois, Missouri, Wisconsin and Iowa have filed a joint brief with this Court.

Project required a more extensive review. Data was compiled to provide a detailed data base for each of the projects requiring further evaluation.[8]

In connection with this review, a public hearing lasting more than nine hours was held in Jonesboro, Arkansas, which is located within the project area. *Public Works for Water and Power Development and Energy Research Appropriation Bill, 1978: Hearings before a Subcomm. of the Comm. on Appropriations House of Representa-*

8. The following is a list of the types of data compiled with respect to each project requiring further evaluation: .

INFORMATION BASE FOR
FURTHER EVALUATION OF
WATER RESOURCE PROJECTS

Responsible agencies will compile the following information in a standard format for all water resources projects not exempted from further evaluation by the initial screening.

A. ECONOMIC

1. Federal and non-Federal Costs:
a. Total.
b. Sunk through FY 1977.
c. To complete. (Tabulate total, land and relocations, and construction for each line).
2. Benefit/Cost Ratios:
a. Current Rate ($6\frac{3}{8}\%$). Remaining Primary.
b. Authorized Rate. Total Primary.
c. Rate applicable for appropriations in fiscal year of initial construction funding Total Primary.
3. Average annual benefits and costs by project output, including separate identification of any flood control benefits from protection of future development: effective non-Federal cost share by purpose, where available.
4. Amounts already paid and remaining to be paid by non-Federal interests and project beneficiaries; terms of repayment.
5. Status of Definite Plan Report or Design Memorandum and Environmental Impact Statement.
6. Net direct employment impact both on- and off-site.
7. Whether opportunity costs associated with foregone recreation benefits and hydroelectric power generation have been incorporated in benefit/cost analysis. If not, estimate dollar venue using market rates.
8. Water use as proposed by project (irrigation: volume of water diverted vs. volume of water consumed; municipal and industrial: average daily per capita water use).

B. ENVIRONMENTAL

1. Significant impacts on:
a. Agricultural and/or forest productivity (acreage, type; cropland, grazing land, forest).
b. Upland wildlife habitat (acreage, types of wildlife affected).
c. Wetland habitat (acreage, type).
d. Commercial and/or sport fisheries resources (area, type).
e. Water quality (short-term, long-term; eutrophication, salinity, flow reductions).
f. Inducement for floodplain development (urban and agricultural acreage).
g. Existing or potential recreational uses (type, magnitude).
h. Threatened or endangered species (specify).
i. Potential induced downstream flooding (magnitude, frequency).
j. Cultural, historic, and archeological resources (type, extent).
k. Parks, wilderness areas, wild, or scenic rivers (specify).
2. Nature and extent of mitigation of or compensation for any adverse impacts listed above and enhancement.

C. SAFETY

(Data required only for projects where credible questions remain to be resolved concerning safety of structures).
1. Status of design in relation to stage of project development.
2. Conditions requiring special consideration in design, such as seismic and foundation conditions.

D. INSTITUTIONAL

1. Identification of beneficiaries, including for direct beneficiaries estimated number of individuals, farms where available and identification of all beneficiaries receiving over 5% of direct project benefits.
2. Any involvement with international obligations.
3. Extent of displacement of area residents.
4. Are costs within project authorization ceiling?
5. Status of local assurances and contractual commitments of non-Federal interests.
6. Extent to which project beneficiaries have been investments whose return is contingent upon completion of the Federal project.
7. Effect on Indians (Federal trust responsibilities, etc.).
8. Litigation.

E. ALTERNATIVES

1. Reasonable alternatives where available.
2. What use of project can be made in present scale or what changes are necessary to make it useful short of completion?
Letter from Cecil D. Andrus, Secretary of the Interior to Senator Henry M. Jackson, 123 Cong.Rec. E1326–1327 (daily ed. March 8, 1977).

*tives*, 95th Cong., 1st Sess. 256 (1977) [hereinafter cited as *Public Works*]. Approximately two thousand two hundred persons attended the hearing. *Id.* at 256–260. Two hundred and sixty-seven individuals spoke at the public hearing; twenty-six spoke in opposition to the project.[9]

The Cache River Project was found, by the representatives of the reviewing agencies, to meet all of the economic, environmental and safety criteria established. Nonetheless, the President recommended the deletion of funding for the project, the deauthorization of the project and that consideration be given to the protection of the remaining bottomland habitat. *Public Works, supra* at 3–5, 12. The following were listed as factors in the President's decision:

> The project would accelerate clearing and drainage of over 110,000 acres of bottomland forest and wooded swamp— one of the last such areas in Arkansas.

> Much of this area is winter habitat for thousands of migratory water fowl traveling on the Mississippi flyway from eight upstream states and Canada.

> The U. S. Fish and Wildlife Service has pointed out that the project would eliminate up to 90% of the existing fishery resources and would cause major adverse impacts downstream, reducing the value of the White River National Wildlife Refuge.

> Benefits from increased soybean production may be overstated and are narrowly distributed (50% of the benefits to about 10% of the landowners); much of the land to be benefited is already productively farmed.

> Adequacy of mitigation measures for wildlife has been questioned.

Despite the President's recommendation, two million dollars for the project for fiscal year 1978 was included in both the House and the Senate versions of the appropriation bill. House Comm. on Appropriations, Public Works for Water and Power Development and Energy Research Appropriation Bill, 1978, H.Rep.No.95–379, 95th Cong., 1st Sess. (1977); Senate Comm. on Appropriations, Public Works for Water and Power Development and Energy Research Appropriation Bill, 1978, S.Rep.No.95–301, 95th Cong., 1st Sess. (1977). A conference report on the two versions of the appropriation bill, including funding for the project, was agreed to by both the House and Senate. 123 Cong.Rec. H7689–H7698, S12707–S12712 (daily ed., July 25, 1977). On August 7, 1977, the President signed the appropriations bill into law. Public Works for Water and Power Development and Energy Research Appropriation Act, 1978, Pub.L. No.95–96, 91 Stat. 797.

## II

■ As the foregoing summary indicates, the Cache River Project has been the subject of extensive and searching review. While at various times during the review process it appeared that this appeal would be rendered moot, Congress, with the endorsement of the President, has now approved a budget for fiscal year 1978 that includes adequate funding to assure continued construction of the next scheduled segment of the project. All of the objections to the project, some of which the appellants claim were not adequately presented in the EIS were exhaustively presented during the process of review. At no time, however, was the review process directed towards the adequacy of the EIS, which is the issue now before this Court.[10] Accordingly, we must

---

9. Among the organizations expressing opposition to the project are the Citizens Committee to save the Cache River Basin, Arkansas Ecology Center, Coastal Environment, Inc., Environmental Defense Fund, Ozark Society, Jefferson Wildlife Society and Jefferson Audubon Society. Also expressing reservations about the project were representatives from the Fish and Wildlife Service, Department of the Interior,

and an Assistant Attorney General, State of Minnesota. *Public Works, supra* at 257–260.

10. The passage by Congress of the appropriations bill does not necessarily represent a determination as to the sufficiency of the EIS.

> Congress must be free to provide authorizations and appropriations for projects proposed by the executive even though claims of illegality on grounds of noncompliance with

still examine each of the issues raised by the appellants with respect to the adequacy of the EIS. In making our determination, we are mindful of the caution expressed by this Court that "[t]he Courts must employ a rule of reason in examination for adequacy of these statements, lest the litigation have no end." *Sierra Club v. Froehlke,* 534 F.2d 1289, 1299 (8th Cir. 1976). *See, e. g., New York v. Kleppe,* 429 U.S. 1307, 1310, 97 S.Ct. 4, 6, 50 L.Ed.2d 38, 42 (1976) (Marshall, J., denying application to vacate stay); *Sierra Club v. Morton,* 510 F.2d 813, 819 (5th Cir. 1975); *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 852 (8th Cir. 1973).

### A.

■ The first contention of the appellants is that the revised EIS fails to evaluate the secondary impact of the project on groundwater levels. We recognize that if an impact significantly affects the environment, it should be considered in the EIS whether the impact is a primary or secondary one. *City of Davis v. Coleman,* 521 F.2d 661, 676 (9th Cir. 1975); *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 n. 9 (9th Cir. 1974).[11] However, "[a]n EIS need not discuss remote and highly speculative consequences. *EDF v. Corps of Engineers,* 348 F.Supp. 916, 933 (N.D.Miss.1972), *aff'd,* 492

F.2d 1123 (5th Cir. 1974). * * * A reasonably thorough discussion of the significant aspects of the probable environmental consequences is all that is required by an EIS." *Trout Unlimited v. Morton, supra* at 1283.

■ It is the appellants' contention that the destruction of river bottomland, coupled with increased agricultural activity, might result in declining groundwater table levels if an increased use of groundwater for irrigation exceeded the rate at which the groundwater level is naturally recharged. While we agree that the EIS could have been improved by a discussion of this issue, we cannot agree that the failure to include a discussion renders the EIS defective since the cumulative secondary impact of the project on the groundwater levels is too remote and speculative.

We recognize that by reducing the depth and duration of flooding, the project is expected to result in increased agricultural activity in the Cache River Basin. We note, however, that the increased agricultural activity is expected to be in the form of more intensive land use, rather than significant increases in the acreage devoted to agricultural use. Over eighty-two percent of the Cache River Basin is now cleared for agricultural use. The major field crop in the area is soybeans. Rice is the only crop in

NEPA are pending in the courts. There is, of course, nothing inconsistent with adoption of appropriations and authorization measures on the *pro tanto* assumption of validity, while leaving any claim of invalidity to be determined by the courts.
*Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 380, 382, 463 F.2d 783, 785 (1971).
There is nothing in the legislative history indicating Congress made a binding determination on the adequacy of the EIS and its compliance with NEPA. *Id.* at 786; *Environmental Defense Fund v. Corps of Eng. of U. S. Army,* 325 F.Supp. 749, 762–763 (E.D.Ark.1971), *aff'd,* 470 F.2d 289 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2740, 37 L.Ed.2d 160 (1973). *Cf. Environmental Defense Fund, Inc. v. Froehlke, supra* at 355.

11. The CEQ guidelines on the preparation of an EIS provide as follows:
Secondary or indirect, as well as primary or direct, consequences for the environment should be included in the analysis. Many major Federal actions, in particular those that involve the construction or licensing of infrastructure investments (e. g., highways, airports, sewer systems, water resource projects, etc.), stimulate or induce secondary effects in the form of associated investments and changed patterns of social and economic activities. Such secondary effects, through their impacts on existing community facilities and activities, or through inducing new facilities and activities, or through changes in natural conditions, may often be even more substantial than the primary effects of the original action itself.
40 C.F.R. § 1500.8(a)(3)(ii).
We do not mean to imply, however, that secondary impacts are always more important or that they need to be considered in an EIS if they do not have a significant impact on the environment. *City of Davis v. Coleman,* 521 F.2d 661, 676 n. 18 (9th Cir. 1975).

the project area which requires a significant amount of irrigation. In 1969, roughly six times more acreage was devoted to soybeans than to rice. At the time the EIS was prepared, federal programs strictly regulated the amount of rice production. In light of the above circumstances making significant increases in the use of groundwater for irrigation remote, we cannot say that the EIS is defective for failing to discuss this issue.[12]

The EIS does extensively discuss the direct impact of the project on groundwater. Moreover, the testimony, from the first trial, of the Corps expert who prepared the groundwater study included in the EIS is reprinted in an appendix to the EIS. Except in localized areas adjacent to the deepened channels, no direct impact of the project on groundwater levels was found. Nor was any significant impact on groundwater levels found because of the cumulative effect of other projects. A section on hydraulics and hydrology, which have a direct relationship to groundwater, is contained in an appendix to the EIS.

Finally, the appellants claim that the EIS discussion with respect to groundwater is inadequate because it did not include data from a study by the U. S. Geological Survey in progress at the time the EIS was prepared and still in progress at the time the hearing was held in 1975. The study was a detailed groundwater hydrologic modeling study of the Cache-White River Basin area. The first phase of the study was not scheduled to be completed until 1976. The Corps is not required to wait for the completion of studies by other agencies, cf. *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 88 (2d Cir. 1975), because an EIS must have terminal facilities. *Sierra Club*

v. *Froehlke, supra* at 1299. The EIS contained an adequate discussion as to the direct impacts of the project on groundwater and, thus, the decision of the Corps not to wait for the study results was not an arbitrary one. Moreover, the U. S. Geological Survey study was referred to in the testimony of the Corps groundwater expert. This reference is sufficient to alert interested persons to the existence of the study. Cf. *Iowa Citizens for Environmental Quality, Inc. v. Volpe, supra; E. D. F. v. Corps of Engineers,* 470 F.2d 289, 297 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2740, 37 L.Ed.2d 160 (1973).

Accordingly, we do not find that the groundwater discussion in the EIS is fatally deficient because of its failure to consider cumulative secondary impacts on groundwater and because the Corps did not wait to include the U. S. Geological Survey study in the EIS.

### B.

■ The second contention raised by the appellants is that the EIS does not adequately address the implications of the direct and secondary impacts of the project on state and federal water quality requirements and, thus, fails to comply with the CEQ guidelines on the content of an EIS.

The guidelines provide:

(a) The following points are to be covered [in an EIS]:

\* \* \* \* \* \*

(2) The relationship of the proposed action to land use plans,[13] policies, and controls for the affected area. This requires a discussion of how the proposed action may conform or conflict with the objectives and specific terms of approved or

---

12. We also note that the appellants principally attack the adequacy of the EIS discussion of the impact of the project on groundwater through the testimony of Gilbert J. Strammel who had prepared a report on the project for the Arkansas Planning Commission. Comments with respect to the draft revised EIS were solicited and received from the Arkansas Planning Commission. Strammel's report, however, was not submitted to the Corps. Had the report been submitted, it would have been

included in the EIS in accord with the policy of the Corps and the regulations of the CEQ. 40 C.F.R. § 1500.10.

13. The EIS states that "[i]nvestigations made in connection with development of this statement have revealed no specific, official local, regional, state, or national land use plans or policies applicable to the project area." This is not disputed by the appellants.

proposed Federal, State, and local land use plans, policies, and controls, if any, for the area affected including those developed in response to the Clear Air Act or the Federal Water Pollution Control Act Amendments of 1972.

40 C.F.R. § 1500.8(a)(2).

The appellants argue that the EIS fails to discuss the impact of the project in terms of the Arkansas Water Quality regulation promulgated in compliance with the 1972 amendments to the Federal Water Pollution Control Act. 33 U.S.C. § 1151 *et seq.* Regulation Establishing Water Quality Standards for Surface Waters of the State of Arkansas, Regulation No. 2, State of Arkansas Department of Pollution Control and Ecology (as amended September, 1973). We cannot agree that the EIS was required to discuss this impact since it was not established that the project does in fact conflict with the state water quality standards. Arkansas exempts every channeled stream from the state water quality standards and, thus, the project does not conflict with the state water quality standards.[14] We further note that the Arkansas Department of Pollution Control and Ecology found the EIS to be adequate.

■ At several points in the EIS, the impact of the project on water quality is discussed. The EIS recognizes that the cumulative effect of the construction and increased agricultural activity will result in increased turbidity and increased concentrations of agricultural pollutants. The EIS also includes the comments of the Environmental Protection Agency [EPA] in an appendix. The EPA statement discusses serious problems with the project's potentially harmful long-term effects on water quality. After reviewing the material in the EIS with respect to the impact of the project on

water quality, we conclude that the discussion was adequate and sufficient to give notice of a significant impact of the project on water quality.

Moreover, we note that the question of the impact of the project on water quality and the project's compliance with the 1972 amendments to the Federal Water Pollution Control Act is still the subject of review. The Corps of Engineers is conducting permit proceedings under 33 U.S.C. § 1344 with respect to permits for the discharge of dredged or fill materials. The principal concern of these proceedings is the impact on water quality. Public hearings are held and the permit is subject to guidelines developed by the EPA. 33 U.S.C. § 1344(b) and (c).

### C.

The third contention of the appellants is that the EIS fails to adequately evaluate conflicting scientific judgments about the cumulative effect of the destruction of Arkansas river bottomlands on the migratory waterfowl of the Mississippi Flyway. The trial court concluded that "there was an adequate, objective, scientific basis for the conclusions reached in the revised EIS" with respect to the waterfowl. We do not find this conclusion to be clearly erroneous.

One of the most controversial aspects of the project is its impact upon migratory waterfowl. It has been stated that:

[w]hen, as here, the issue of procedure relates to the sufficiency of the presentation in the statement, the court is not to rule on the relative merits of competing scientific opinion. Its function is only to assure that the statement sets forth the opposing scientific views, and does not

---

14. The appellants contend that the trial court improperly sustained the federal appellees' objection to certain testimony of Neil Woomer, the chief ecologist in the water pollution control division of the Arkansas Department of Pollution Control and Ecology. The appellants' offer of proof indicated that Woomer would have testified that another channelization project resulted in water quality conditions in violation of the Arkansas standards such that

an exemption was necessary. It was within the discretion of the trial court to refuse to admit this testimony as irrelevant since it related to a different project constructed at a different time and under different standards. The testimony as to the violations of the state water quality standards was also irrelevant since it was established that Arkansas exempted all channeled streams from the standards.

take the arbitrary and impermissible approach of completely omitting from the statement, and hence from the focus that the statement was intended to provide for the deciding officials, any reference whatever to the existence of responsible scientific opinions concerning possible adverse environmental effects. * * * The agency need not set forth at full length views with which it disagrees, all that is required is a meaningful reference that identifies the problem at hand for the responsible official.

*Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 380, 384, 463 F.2d 783, 787 (D.C.Cir. 1971) (footnote omitted). *See also Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292, 1302 (8th Cir. 1976), *cert. denied,* 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977).

■ The EIS contains an extensive description of the waterfowl in the Cache River Basin as part of its description of the existing environmental setting, as well as a lengthy description of the impact of the project on waterfowl.[15] The impact of the project on waterfowl is again mentioned in the section of the EIS entitled "Adverse Environmental Effects Which Cannot be Avoided Should the Proposal be Implemented." An appendix to the EIS reprints the comment letters of the U. S. Fish and Wildlife Service and six state fish and wildlife agencies, as well as several other comments which were critical of the EIS's conclusion and discussion of the impact of the project on waterfowl. Also included in an appendix to the EIS is the Report of the Chief of Engineers, Department of the Army, Modification of Cache River Basin Feature, Mississippi River and Tributaries Project, Ar-

kansas, H.Doc.No. 92–366, 92d Cong., 2d Sess. (1972). This report formed the basis for the wildlife mitigation plan adopted by Congress in 1974.

The Corps concluded that while the project will have "some rather significant effects" upon the distribution of mallards [16] in the project area, "there is no indication that the project will have significant or even measurable impacts upon flyway mallard populations." The following factors are among those relied upon by the Corps as the basis for its conclusion: (1) a study which correlated migratory waterfowl counts since 1958 with acres of woodlands drained and cleared by similar projects and found the loss of woodlands had no detectable cumulative effect on the waterfowl count; [17] (2) studies showing that the mallard population of the Cache River Basin accounted for only 4.3 percent of the Mississippi Flyway mallard population; (3) that even without the project, much of the woodland will be cleared in the future; and (4) the project does provide for up to seventy thousand acres of mitigation land in addition to the sixteen thousand acres already serving as state wildlife protection areas. The EIS does reprint adverse comments and refers to them in its evaluation. While this Court does not necessarily agree with the conclusion reached by the Corps, we find that it is adequately supported. We further find that the EIS does not arbitrarily omit reference to conflicting views and contains a sufficient reference to such views as to put the decisionmakers on notice of their existence.

■ The scope of our review is limited to a determination as to the sufficiency of the

---

15. The brief filed by amici curiae States of Minnesota, Illinois, Missouri, Wisconsin and Iowa criticizes the EIS for not including a report from the Midwest Research Institute commissioned by the Corps. The EIS does refer to the existence of the report. We note that it is well settled that supporting studies need not be physically attached to an EIS as long as they are otherwise available. *Trout Unlimited v. Morton,* 509 F.2d 1276, 1284 (9th Cir. 1974); *Life of the Land v. Brinegar,* 485 F.2d 460, 468–469 (9th Cir.), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1973).

16. Mallards constitute over ninety percent of the ducks wintering in the Cache River Basin.

17. The appellants question the validity of this study because of its failure to consider other factors which might influence waterfowl populations and because of uncertainties with respect to the nature of the waterfowl counts. We recognize that these criticisms affect the weight to be given to the study.

EIS and its compliance with the requirements of NEPA. We note moreover that in light of the mitigation plan and the extraordinary executive and congressional review process, it would be singularly inappropriate for this Court to substitute its judgment for that of Congress as to the impact of the project on migratory waterfowl and the adequacy of the mitigation plan.

One of the reasons this Court found the first EIS to be inadequate was its failure to give sufficient consideration to the possibility of mitigation. *Environmental Defense Fund, Inc. v. Froehlke, supra* at 351–352. The final EIS does include a discussion of the mitigation plan subsequently adopted by Congress. The principal purpose of the mitigation plan passed by Congress in 1974 was to reduce the impact of the project on migratory waterfowl. The trial court found nothing in the record indicating that the mitigation plan would not be accomplished. The mitigation plan adopted by Congress requires that at least twenty percent of the funds appropriated each fiscal year for the project be spent on mitigation until the full mitigation amount has been appropriated. Thus, the Corps cannot proceed with the project without proceeding with the implementation of the mitigation plan. Indeed, its failure to do so would give rise to a judicially cognizable cause of action, *cf. Sierra Club v. Mason,* 365 F.Supp. 47 (D.Conn.1973), to halt further construction of the project.

The brief filed by amici curiae points to the lack of experience of the Corps with the implementation of mitigation plans with "fear and trepidation." While the Corps' lack of experience and its failure to acquire more than one hundred and twenty acres of mitigation land is a matter of concern, it does not necessarily justify the inference that the Corps will not in good faith proceed with the implementation of the mitigation plan. As the trial court found, the testimony at the hearing indicated that the Corps intends "to spend substantially more than twenty percent of the funds appropriated in the early stages of the project."

The Corps has scheduled the acquisition of some fifteen thousand acres of mitigation land by mid-1978. We emphasize that the Corps is under a continuing obligation to comply with the mitigation plan.

We recognize that the mitigation plan, as adopted by Congress, is not problem-free. There may be difficulties in managing as a waterfowl unit the mitigation lands acquired under a wildlife easement. The up to seven million dollars currently authorized by Congress may be insufficient to acquire the maximum of seventy thousand acres under the mitigation plan. In light of the presidential and congressional concern that has been expressed with respect to the need for mitigation, we cannot conceive that Congress will fail to make the appropriations necessary to insure the full completion of the mitigation plan.

Finally, we note that questions as to the adequacy of the mitigation plan were among the factors cited by President Carter as part of his decision to recommend the discontinuation of the project. It is, thus, clear that questions as to the impact of the project on migratory waterfowl were again brought to the attention of Congress. The appropriation of funds for the project after the exhaustive review process and despite the recommendation of the President, clearly represents a determination by Congress as to the adequacy of the mitigation plan.

### D.

The fourth contention of the appellants is that the trial court erred in failing to require that the EIS evaluate the alternative proposed by the Arkansas Game and Fish Commission of a leveed floodway with bypass features. The EIS is specifically required by NEPA to discuss alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii) and (2)(E); 40 C.F.R. § 1500.8(a)(4).

The EIS does contain an extensive discussion of several alternatives to the project. A detailed summary of the benefits, costs and cost-benefit ratios of each of the alternatives, both with and without mitigation,

is included in the EIS.[18] The EIS does not, however, include any reference to an alternative of a leveed floodway with bypass features suggested by a representative of the Arkansas Game and Fish Commission. An oral presentation of this alternative was not made to the Corps until June 10, 1974. The trial court found that this alternative was "too late to be included as the EIS was then substantially in its final printed form." This finding is not clearly erroneous.

The draft revised EIS was circulated for comment in December, 1973. The guidelines of the CEQ and the Corps provide, respectively, for forty-five and ninety days for comments. 40 C.F.R. § 1500.9(f); 33 C.F.R. § 209.410(k)(1). The Arkansas Game and Fish Commission submitted timely comments to the draft revised EIS in January, 1974, but did not mention the alternative of a leveed floodway with bypass features. This alternative was not presented to the Corps until six months later in June, 1974. We recognize that the time period allowed for comment is limited and, thus, may, in some instances, restrict the development of detailed alternative concepts. This, however, is not an appropriate consideration here in light of the twenty-seven-year history of the project. Thus, it is not unreasonable to expect that the alternative could have been proposed in a more timely fashion. We also note that all relevant comments received in time were published. As this Court has held, "an EIS must have terminal facilities." *Sierra Club v. Froehlke, supra* at 1289. As has been stated:

> The environmental impact statement is not to be equated to a trial court record which is examined on appeal by a higher court. Although the impact statement

should, within reason, be as complete as possible, there is nothing to prevent either the agency involved, or the parties opposing proposed agency action, from bringing new or additional information, opinions and arguments to the attention of the "upstream" decision-makers even after the final EIS has been forwarded to CEQ.

*Environmental D. Fund, Inc. v. Corps of Eng. of U. S. Army,* 342 F.Supp. 1211, 1217 (E.D.Ark.), *aff'd,* 470 F.2d 289 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2740, 37 L.Ed.2d 160 (1973).

This was done here. The alternative of a leveed floodway with bypasses was brought to the attention of the Corps too late to be included in the EIS. It is, nonetheless, being given consideration by the Corps.

Moreover, we note that the EIS did discuss two alternatives similar to the leveed floodway with bypass features. The EIS contains a discussion of a leveed floodway system with flowage easements and a leveed floodway system with fee acquisition of the land between the levees for the protection of environmental resources.[19]

Thus, we hold that the trial court did not err in failing to require that the alternative of a leveed floodway with bypass features be discussed in the EIS.

### E.

The final issue raised is whether the trial court erred in holding that the actual balance of costs and benefits struck by the Corps gave sufficient weight to environmental factors and was not arbitrary and capricious.

 As this Court held when it first considered the project, a reviewing court has an obligation to review substantive

---

18. The EIS states that the procedures, methodology and sample calculations used in the economic analysis of the alternatives would be available upon request. This is sufficient. *See* note 15, *infra.*

19. The discussion of these alternatives was included in the final revised EIS in response to comments made with respect to the draft revised EIS. Thus, interested parties did not have an opportunity to comment on these alter-

natives. We recognize that the comment stage is of critical importance in the decisionmaking process under NEPA. *Cf. Appalachian Mountain Club v. Brinegar,* 394 F.Supp. 105, 121–122 (D.N.H.1975). However, not every addition to the EIS made in response to comments is such as to require a formal supplement to the EIS which must be processed in the same fashion as a new EIS for to do so would make the NEPA review process be one without end.

agency decisions on the merits to determine if they are in accord with NEPA. *Environmental Defense Fund, Inc. v. Froehlke, supra* at 353. We have done so and find that the decision is neither arbitrary nor capricious. Thus, we are not empowered to substitute our judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This is particularly true in light of the extraordinary executive and congressional review process.

We have already concluded that the final revised EIS adequately complies with the requirements of NEPA, the CEQ and the Corps' guidelines in each challenged respect. Thus, the EIS contains a sufficient basis on which the Corps could meaningfully balance environmental factors and the decision to proceed was not an arbitrary one. As the trial court concluded,

> [i]t is quite obvious that the Cache River decisionmakers had all of the information in the final EIS when the decision to proceed was made. In fact, it is quite apparent from the record that they had much more besides.

Accordingly, the decision of the trial court is affirmed.

Each party shall bear its own costs.