**MONARCH CHEMICAL WORKS, INC., Plaintiff,**

v.

**J. James EXON, Joseph E. Vitek and City of Omaha, a Municipal Corporation, Defendants.**

Civ. No. 77–0–393.

United States District Court, D. Nebraska.

June 15, 1978.

Annette E. Mason and Bruce G. Mason, Omaha, Neb., for plaintiff.

Gary R. Welch, Asst. Atty. Gen., State of Neb., Lincoln, Neb., for defendants, Exon and Vitek.

James E. Fellows, Deputy City Atty., Omaha, Neb., for defendant, City of Omaha.

## MEMORANDUM

DENNEY, District Judge.

This matter is before the Court upon the plaintiff's motion for a preliminary injunction. Monarch seeks to restrain the named defendants from taking a portion of its property for the construction of a correctional facility until federal environmental statutes and regulations have been observed. Because of the importance of the application for preliminary relief and the closeness of the question, the Court feels compelled to examine the considerable evidence presented in detail.

### East Omaha Redevelopment Plan

The Planning Department of the City of Omaha has described East Omaha as

. . . an area consisting of approximately 120 acres lying south of Eppley Airfield. The area is bounded by Locust Street on the north, Abbott Drive on the west, Avenue G on the south, and East 25th Street on the east. The neighborhood is typified by a generally unorganized mix of low density residential, commercial, and heavy industrial land uses and, with few exceptions, the total absence of any public improvements including storm drainage, paved streets, or sidewalks.

For over twenty years, the City has recognized the undesirability of this pattern of land use. The problem has been addressed in a series of studies over this time period. In each of these studies, analysis of the question has led to the recommendation that "the highest, best, and most practical land use for East Omaha is that of a mixed commercial/industrial area, and that the best course of action for the City is to relocate the residents of East Omaha into safe and sanitary housing in more appropriate residential areas."

In an effort to put this plan into effect, the municipality turned to the federal government for financial aid. After determining that funding was available from the City's allotment of Title I funds under the Federal Housing and Community Development Act, cost estimates were prepared and a redevelopment plan was formulated.

Under Phase I of the redevelopment program, the City would attempt to acquire 77.76 acres of mainly residential and vacant property within East Omaha through voluntary negotiations with the owners. Relocation of those residents whose property was sold would follow. The generally substandard housing would then be demolished, and the acquired property would be filled and graded to promote proper storm drainage. The projected level of federal funding necessary to complete Phase I amounted to an expenditure of $3,800,000.00 over a six year period. The purchase of property owned by existing industries was not contemplated by the redevelopment scheme, as the preferred land use already existed on these tracts.

The second phase of the plan would commence only if some residents of East Omaha declined to participate in Phase I. Eminent domain proceedings would be initiated against holdout owners as soon as adequate industrial interest in the purchase of their property arose. Eventual replatting and installation of public improvements would take place. The paving of streets and installation of storm and sanitary sewers would not be accomplished through the expenditure of Title I funds. These improvements would take place subsequent to a special assessment levy and the establishment of a revolving fund. The latter source of improvement revenue would be funded by the proceeds of resale of the acquired parcels by the City of Omaha to industrial concerns.

An environmental impact statement was completed by the City on February 5, 1976. The City was empowered to engage in the preparation of an EIS by Section 104(h)(1) of the Community Development Act:

. . . the Secretary, in lieu of the environmental protection procedures otherwise applicable, may under regulations provide for the release of funds for par-

ticular projects to applicants who assume all of the responsibilities for environmental review, decisionmaking, and action pursuant to such Act that would apply to the Secretary were he to undertake such projects as Federal projects. 42 U.S.C.A. § 5304(h)(1) (1977).

The Community Development Act further requires the recipient of federal funds "to assume the status of a responsible Federal official under the National Environmental Policy Act of 1969" and "to accept the jurisdiction of the Federal courts for the purpose of enforcement of his responsibilities as such an official." 42 U.S.C.A. § 5304(h)(3)(D) (1977).

The City's impact statement was approved by HUD, and funds were released for commencement of Phase I of the redevelopment scheme.

*Correctional Facility*

In an initially unrelated decision-making process, the State of Nebraska commenced an analysis of its correctional needs. As a result of this analysis, the state legislature authorized the construction of a medium/minimum security facility. The governor appointed a search committee to select an optimal site, and a location within the East Omaha Redevelopment Plan Area was eventually chosen. To effectuate the selection, the Nebraska Department of Corrections entered into a contract with the City of Omaha for the transfer of a tract of land extending from East 23rd Street on the west to East 27th Street on the east, and from Woodland Road on the south to "J" Avenue on the north. This agreement, which was executed on March 15, 1977, was authorized by the City Council subsequent to an amendment to the redevelopment plan. Under this contract, the City covenanted to acquire title from individuals, families and businesses who owned land within the boundaries of the proposed complex area. The agreement further authorized the City of Omaha to "commence eminent domain proceedings, if necessary, in the event of unsuccessful acquisition negotiations." Thus, with regard to the medi-

um/minimum correctional facility, the original redevelopment plan was altered in two ways: the acquisition of land owned by businesses was now authorized, and the use of eminent domain by the City was accelerated.

Although the subject of funding was not specifically addressed, it appears that the contract between the City and the State contemplated the use of federal money for the initial acquisition of property, the demolition of all structures thereon and the relocation of displaced individuals. This interpretation, which was not disputed by any of the defendants' witnesses, is in accordance with the State's apparent desire to complement rather than disrupt the City's efforts in East Omaha. The agreement was considerably more specific on the subject of the State's ultimate accession to title. The contract called upon the State of Nebraska to pay for the property itself, all necessary appraisals, reasonable business relocation costs, demolition expenses, personnel costs and miscellaneous fees up to a ceiling of $495,000.00. If the total expense exceeded that figure, the City agreed to pay the excess from its own funds or from federal sources.

No supplemental impact statement was prepared to analyze the environmental consequences of the establishment of a correctional facility within the confines of the redevelopment project.

In accordance with the agreement, the City of Omaha initially attempted to acquire various discrete tracts of land owned by the Monarch Chemical Works through negotiation. Subsequently, eminent domain proceedings were commenced. Monarch challenged the power of the City to condemn its property in this manner, and obtained a restraining order from a state court judge on June 28, 1977. This prohibition against the City is currently being appealed to the Nebraska Supreme Court.

On November 4, 1977, the Monarch Chemical Works filed a second lawsuit in federal district court. This action alleges a violation of the National Environmental Policy Act of 1969 due to the failure of

Omaha to update the original East Omaha Redevelopment Plan impact statement.

Faced with inflationary rises in construction costs, the State re-evaluated its commitment to the construction of the correctional facility in East Omaha and decided to proceed as expeditiously as possible. An amended agreement was drawn up which altered the acquisition scheme. Rather than waiting for the City to overcome legal obstacles to the exercise of its power of condemnation, the State proposed to proceed with the acquisition of the Monarch property by exercising its independent eminent domain power through the Department of Correctional Services. The amended agreement emphasized that

> . . . the City and State fully understand and acknowledge that the action by the State, if commenced in County Court, to acquire the Monarch Chemical Works, Inc. property through the process of eminent domain by the State is strictly a State action, that any such acquisition and award is considered paid out of State funds, and at no time shall any amount . . . be considered as funds from any other source other than State funds.

Although this change in the acquisition scheme is not formally in effect at the present time, its application appears to be imminent.

It is against this factual backdrop that the Court must consider Monarch's claim of a NEPA violation, the defendants' assertion that no jurisdiction exists, and the question of the plaintiff's standing.

*Standing*

The Monarch Chemical Works' original complaint contained only one reference to the character of the damage suffered due to the acts of the defendants. It was alleged that plaintiff's

> economic and personal interest will be injured and adversely affected, and its full use and economic enjoyment of its property will be directly and adversely affected if the Medium Minimum Security Correctional Facility segment of the · East Omaha Redevelopment Project is constructed.

To establish standing, a party must show "that the challenged action has caused him injury in fact" and that the interest injured is "arguably within the zone of interests to be protected or regulated by the statute." *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 152–53, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Environmental decisions have given effect to the spirit of NEPA by allowing litigants to proceed upon a demonstration of a minimal injury in fact. *See, e. g., Coalition for the Environment v. Volpe*, 504 F.2d 156 (8th Cir. 1974); *Save the Courthouse Comm. v. Lynn*, 408 F.Supp. 1323 (S.D.N.Y.1975).

Despite the liberality in the case law, the Court held that Monarch's original complaint did not satisfy the second portion of the *Data Processing* test due to the lack of any allegation of injury to an environmental interest. In so holding, the Court was not unaware of the fact that some jurisdictions have found economic harm to be sufficient to give a plaintiff standing to raise environmental issues. Rather, the Court felt bound by the dictum in *United States v. 255.25 Acres of Land*, 553 F.2d 571 (8th Cir. 1977). In that case, an Eighth Circuit panel considered the appeal of various landowners from condemnation proceedings initiated by the Secretary of the Army. While the Circuit Court specifically held that environmental defenses were not cognizable in condemnation proceedings, the following observation was made about the appellants' complaint:

> . . . the landowners here made no allegations of harm to the environment, have alleged no interest in the environment and have made no claim as to being within the zone of interests protected by NEPA; nor do they allege any injury to themselves within the scope of NEPA or the other Acts.
>
> *255.25 Acres of Land* at 572 n. 2.

This statement suggests that the Eighth Circuit would, if directly presented with the question, adopt the view that the

interest at stake must be environmental rather than economic before standing exists under NEPA. *See, e. g., Clinton Community Hosp. Corp. v. S. Md. Medical Center,* 374 F.Supp. 450 (D.Md.1974), *aff'd* 510 F.2d 1037 (4th Cir. 1975), *cert. denied* 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975); *Zlotnick v. District of Columbia Redevelopment Land Agency,* 2 ELR 20235 (D.D.C. 1972), *aff'd* 161 U.S.App.D.C. 238, 494 F.2d 1157 (1974), *cert. denied* 419 U.S. 963, 95 S.Ct. 223, 42 L.Ed.2d 178 (1974).

The plaintiff subsequently amended its complaint in an attempt to come within the protections of NEPA. Monarch now claims that it will suffer from air and noise pollution during the construction of the correctional facility. Further alleged are deleterious changes in patterns of land use, population density and traffic. Monarch also cites increased demands upon existing drainage systems and utility services. The plaintiff further maintains that construction of the penal facility would require a cessation of its oil recycling operations, with a concomitant increase in the use of natural petroleum resources. This termination would allegedly be mandated by recently promulgated EPA regulations, which require the maintenance of a sump area for runoff in case of emergency. Monarch claims that the only feasible location for such a sump is within the area sought by the State for its correctional facility.

The defendants have challenged Monarch's standing by presenting considerable evidence that the plaintiff is motivated by business considerations rather than any endearment toward environmental values. According to the defendants, Monarch's filing of a lawsuit premised on NEPA is nothing more than a delaying tactic.

The defense is not entirely without merit. For example, it seems rather anomalous that the plaintiff should complain of potential dirt and noise pollution during the construction of the correctional facility when Monarch's own operations create enough air pollution to require a variance under the Clean Air Act.

■ Despite these difficulties, the Court believes that the amended complaint raises legitimate environmental concerns sufficient to give Monarch standing to argue the merits of its application for preliminary relief. Even though the plaintiff has an obvious financial interest in stopping the construction of the facility, the Court is unwilling to conclude that the individuals who make up the Monarch corporation

> are motivated solely by protection of their own pecuniary interest and that the public interest aspect is so infinitesimal that it ought to be disregarded altogether. It is not part of our function to weigh or proportion these conflicting interests. Nor are we called upon to determine whether persons seeking to advance the public interest are indeed conscientious and sincere in their efforts. True, the [plaintiff is] not primarily devoted to ecological improvement, but [it is] not on this account disqualified from seeking to advance such an interest.

*National Helium Corp. v. Morton,* 455 F.2d 650, 655 (10th Cir. 1971).

*Original Impact Statement*

Despite the fact that the City originally prepared an extensive environmental impact statement on the East Omaha project, the defense is now advanced that NEPA was never applicable to this federally funded activity. The City relies on 24 CFR § 58.25 (1977), which requires the preparation of an impact statement for projects "which would remove, demolish, convert or emplace a total of 500 or more dwelling units" or for water and sewer projects "which will serve undeveloped areas of 100 acres or more."

■ While the East Omaha Redevelopment Project is too small to fall within either of these categories, the Court does not feel that this regulation constitutes a mandatory prerequisite to the consideration of environmental values. Many projects of lesser size than those referred to in this regulation could have a substantial impact on important interests. The regulation does not state that only those projects that

attain a certain numerical threshold need be considered environmentally significant under NEPA. Rather, HUD requires an impact statement when the magnitude of a federally funded project reaches the point where environmental effects are presumed to exist.

The City's past actions belie its current assertion that the East Omaha Project has only minor environmental consequences. No qualification was made in the original impact statement to this effect. In fact, the City caused the following legal notice to be printed in various newspapers on October 28, 1975:

NOTICE OF FINDING OF SIGNIFICANT EFFECT

The City of Omaha, under Part 58, Environmental Review Procedures for the Community Block Grant Program, has found that the East Omaha Relocation and Redevelopment Project has a significant effect on the environment and requires an Environmental Impact Statement (EIS) . . . ..

■ After considering the City's past pattern of behavior and the environmental consequences of the relocation of an entire community, the Court holds that the original EIS was required under NEPA.

*EIS Revision*

■ Compliance with the National Environmental Policy Act does not cease upon preparation of an EIS. The author of an impact statement has an ongoing duty to review its continuing vitality in light of changing conditions. New developments may render the original EIS inadequate, in which case a supplemental impact statement is required. W. RODGERS, HANDBOOK ON ENVIRONMENTAL LAW § 7.7 at 774 (1977).

Federal regulations delineating environmental review procedures for the Community Development Block Grant Program recognize this need. Under 24 CFR § 58.19 (1977), the following guidelines appear:

(a) *Original or updated environmental review.* A project which is a continuation of a previously commenced activity or

activities for which no environmental review or clearance has been completed or for which previously conducted environmental reviews are insufficient due to changed circumstances, including the availability of additional data or advances in technology, must be subjected to an original or updated environmental review under this Part. Such review shall be carried out with respect to the entire project to the extent that the entire project or portions of it could still be altered in light of environmental considerations.

. . . . .

(c) *No new environmental review.* A project which is a continuation of a previously commenced activity or activities for which environmental review or clearance has been completed and for which circumstances, including the availability of additional data or advances in technology, have not changed significantly, requires no new environmental review or clearance by virtue of such project's funding under Title I. The applicant shall prepare a written decision to that effect, which shall set forth the reasons therefor.

The City of Omaha never complied with these regulations due to its belief that federal environmental strictures were inapplicable to the construction of the correctional facility and the corresponding change in the East Omaha Plan.

■ When the entity responsible for the evaluation of a need for an EIS decides that a given action is neither major nor federal, it must set forth the reasoning behind that conclusion. The threshold decision not to file an impact statement is subject to a judicial review of its reasonableness under the circumstances. *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1319–20 (8th Cir. 1974); *Patterson v. Exon*, 415 F.Supp. 1276, 1281 (D.Neb. 1976).

The same standard of review applies to the decision not to update an impact statement. Since the City has not taken the required procedural steps under the regula-

tions, no record exists for this Court to review.

Under these circumstances, the Court feels compelled to grant the plaintiff relief as to the City of Omaha. In so doing, the Court desires to emphasize that its role in cases of this type is one of review and not of substantive decision-making. The Court does not want to imply that the City ought to update its environmental review or should refrain from such supplementation. The Court only mandates that the City of Omaha must make a bona fide evaluation of the sufficiency of the original EIS in light of the changed circumstances within the East Omaha area, and must establish a suitable record for review purposes. Without such a process by the municipality, a federal court cannot ascertain whether rational decision-making is taking place.

### State-City Nexus

Successfully obtaining a preliminary injunction against the City is of little practical value to the plaintiff if the State of Nebraska can independently condemn the property involved. Monarch seeks to avoid such a result by praying for injunctive relief against two representatives of the State.

Power exists in a federal court to enjoin non-federal concerns pending the observance of environmental duties if a "partnership" with the federal government can be shown. *Biderman v. Morton*, 497 F.2d 1141, 1147 (2d Cir. 1974). The presence of federal funds is typically sufficient to establish such a relationship. *Edwards v. First Bank of Dundee*, 534 F.2d 1242, 1245–46 (7th Cir. 1976); *Silva v. Romney*, 473 F.2d 287, 289–90 (1st Cir. 1973); *Lynn, supra*, 408 F.Supp. at 1344.

In the presently existing arrangement between the State and the City, Omaha is obligated to expend federal funds for various activities preliminary to construction. The State of Nebraska will eventually reimburse the City with nonfederal funds. Despite the ultimate repayment, the Court holds that the relationship is sufficiently close for an injunction to issue. Significantly, the arrangement entered into was a consensual one. *See Named Individual Members of San Antonio Conservation Society v. Texas*, 446 F.2d 1013, 1028 (5th Cir. 1971), *cert. denied* 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972). The evidence demonstrates that the State and the City have worked together for the establishment of a correctional facility, with the aid of federal funding, for over a year. This constitutes the sort of "lengthy, extensive and close-working relationship" between a nonfederal entity and a governmental unit acting as a federal agency to justify the issuance of an injunction. *Lynn, supra*, 408 F.Supp. at 1344.

Furthermore, the contractual nexus between the City and the State is a sufficient "federal sanctioning" of State activity for "major federal action" to exist under NEPA. Impact statement preparation has been required by courts where the federal involvement has been smaller than that in the present case. *See, e. g.*, W. RODGERS, *supra*, § 7.6 at 761–63 (1977). While the case law is not unanimous in its granting of injunctive relief whenever federal involvement exists, the thread that runs through the decisions is the presence of federal authority to exercise discretion over the outcome. W. RODGERS, *supra*, § 7.6 at 763. That test is satisfied in the present case. The City of Omaha has acquired all of the land necessary for the penal facility except that owned by the plaintiff. Unless the City transfers these parcels, the project cannot become reality. When a governmental entity purchases land with federal funds while acting as a federal agency for environmental purposes, and various environmental duties are not fulfilled, an injunction is proper not only against the governmental unit, but against all transferees. Since the City has the authority to control any environmental impact by refusing to convey, it has the required "discretion over the outcome" of the project even though a contractual breach might result.

502

■ The State of Nebraska has sought to remove all traces of federal taint in the acquisition of the plaintiff's property by negotiating a contractual amendment whereby its independent power of eminent domain would be used to condemn the Monarch land. The Court holds that the requirements of NEPA cannot be evaded by such a course of action. Under the National Environmental Policy Act, the act of withdrawing an application for federal funds does not amount to relief from environmental responsibility. If the project has become irrevocably federal, a subsequent attempt to purge the venture of all traces of United States' involvement cannot succeed. *Scottsdale Mall v. Indiana*, 549 F.2d 484, 489 (7th Cir. 1977), *cert. denied* 434 U.S. 811, 98 S.Ct. 47, 54 L.Ed.2d 68 (1978); *San Antonio Conservation Society*, 446 F.2d at 1027.

■ The Court further holds that the contractual relationship between the City of Omaha and the State of Nebraska is so dependent upon federal dollars that the amendatory agreement would not have the effect of excusing NEPA compliance even if it were adopted. If the attempted withdrawal of federal funds as to the Monarch land would take place, the fact remains that all of the non-Monarch lots were purchased with federal funds. As a whole, the project is federal and subject to NEPA.

Although the State of Nebraska does not specifically raise the issue, the Court is reluctant to hold that a sovereign state cannot exercise its right to condemn for the good of its citizens. Healthy relations between the federal government and the several states would be strained if federal courts unnecessarily interfered with state court condemnation proceedings.

Several federal courts have enjoined political entities and subdivisions from exercising their condemnation powers until NEPA compliance had been litigated. *See, e. g., Gibson v. Ruckelshaus*, 1 ELR 20337, *rev'd on other grounds sub nom. City of Lufkin v. Gibson*, 447 F.2d 492 (5th Cir. 1971). Particularly persuasive is the reasoning of the Eighth Circuit in *Stockslager*

*v. Carroll Elec. Coop. Corp.*, 528 F.2d 949 (8th Cir. 1976). In that case, a three judge panel reversed the trial court's denial of an injunction against "construction upon lands which are the subject of condemnation actions in the state courts . . . ." *Stockslager, supra*, 528 F.2d at 951. The refusal to enjoin the defendants in *Stockslager* was based upon 28 U.S.C.A. § 2283 (1978), the federal anti-injunction statute, rather than on notions of relative federal and state power. Despite this distinction, the Court finds the following statement to be applicable to the case at bar:

> Surely, if and when state court proceedings are in derogation of the requirements placed on the federal government by Congress to carry out the national environmental policy, we would not be according the statutory language its full sweep if we did not find authority to enjoin the offending state proceedings. *Stockslager*, 528 F.2d at 952–53.

■ From the foregoing analysis, the Court concludes that the Monarch Chemical Works has demonstrated a likelihood of success on the merits in this suit. Since the condemnation of its land would result in irreparable harm to the plaintiff, the Court holds that the issuance of a preliminary injunction is appropriate.

In so ruling, the Court emphasizes that it has no desire to thwart the obvious desire of the citizens of the State of Nebraska to erect a correctional facility in the Omaha area. All of the parties acknowledge the need for the complex and the rehabilitative opportunities that it would afford inmates, and the Court concurs in that conclusion. However, it is the duty of this Court to apply the law rather than engage in subjective value judgments. Substantive decision-making must be done by the parties. Hopefully, the defendants will immediately engage in a *bona fide* and objective evaluation of the environmental factors at issue in this litigation, so that the correctional needs of the State of Nebraska will not remain unsatisfied any longer than is absolutely necessary.

*Bond*

Rule 65(c) of the Federal Rules of Civil Procedure provides as follows:

> (c) Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

 In NEPA cases, courts have recognized that private enforcement of environmental duties would be hindered if more than a nominal bond were required. *See, e. g., Friends of Earth, Inc. v. Brinegar,* 518 F.2d 322 (9th Cir. 1975); W. RODGERS, § 7.10 at 806–07. The ability of the moving party to put up a sufficient bond is significant.

While Monarch appears to have the wherewithal to post a sum adequate to guard the defendants against damages sustained from an improvident issuance of a preliminary injunction, the need for a full indemnification bond may not exist in this case. The likelihood of a wrongful injunction in the present case is slight, given the fact that the majority of the evidence on the pivotal issues has already been presented.

 Despite the fact that Rule 65(c) does not require the posting of security for the full construction cost increase under these circumstances, the Court feels that the potential damage to the State is too great to dispense with a bond altogether. After weighing all of the proper factors involved, the Court orders that a bond of $10,000.00 shall be posted, and that the issuance of the preliminary injunction is contingent upon payment of this sum to the clerk of the court.

An order has been entered contemporaneously herewith in accordance with this memorandum opinion.