**MONARCH CHEMICAL WORKS, INC., Appellant,**

v.

**Governor Charles THONE, Jack Falconer, City of Omaha, a Municipal Corporation, Appellees.**

**No. 79–1181.**

United States Court of Appeals, Eighth Circuit.

Submitted May 18, 1979.

Decided Aug. 16, 1979.

Annette Mason (argued) of Ross & Mason, Bruce G. Mason, Omaha, Neb., on brief for appellant.

Patrick W. Kennison, Asst. City Atty., Omaha, Neb., argued; Herbert M. Fitle and James E. Fellows, Omaha, Neb., on brief for appellee City of Omaha.

John E. Brown, Asst. Atty. Gen., Lincoln, Neb., argued; Paul L. Douglas, Atty. Gen. and Gary R. Welch, Asst. Atty. Gen., Lincoln, Neb., on brief for appellee Governor.

Before GIBSON, Chief Judge, HEANEY and McMILLIAN, Circuit Judges.

HEANEY, Circuit Judge.

Monarch Chemical Works, Inc., appeals from an order of the District Court, refusing to permanently enjoin the construction of a medium-minimum security prison by the State of Nebraska in the East Omaha area of Omaha, Nebraska. Monarch contends that the construction of this facility without a full environmental review violates the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Federal Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq.* We affirm.

The history of this case has been fully set forth in two comprehensive opinions of the District Court.[1] We repeat only those facts pertinent to this appeal.

East Omaha is an area within the City of Omaha, consisting of approximately 120 acres of land lying south of Eppley Airfield. The area is characterized by a mix of low density residential, commercial and heavy industrial land uses. It is also characterized by an almost total absence of public improvements such as storm drainage, paved streets and sidewalks.

In an effort to upgrade this area, the East Omaha Redevelopment Plan was adopted by the City in 1976. According to this Plan, residents of the generally substandard housing would be relocated out of the area and the land would be converted to industrial uses more compatible with the general character of the area. Redevelopment was to be accomplished in two phases. Under the first phase, the City planned to acquire 77.76 acres of land through voluntary negotiations with property owners. Any existing housing would then be demolished and the property would be filled and graded for resale to industrial users. Under the second phase, eminent domain proceedings would be instituted against landowners who refused to voluntarily sell, if sufficient interest in their property was shown by potential industrial users. Funds for the acquisition and clearing of the property by the City were to be obtained from the federal government under the Federal Housing and Community Development Act. The paving of streets and the installation of storm and sanitary sewers was to be accomplished through a special assessment levy and through a revolving fund which would use monies obtained from the resale of the property acquired by the City to private industry.

An Environmental Impact Statement (EIS) for the project was completed by the City on February 5, 1976.[2] The EIS was approved by HUD and federal funds were released for the first phase of the project. No challenge to the adequacy of this EIS has been made.

In an unrelated series of events, the Nebraska State Legislature authorized the construction of a medium-minimum security prison to be built in Douglas County, Nebraska. A committee was appointed to select a site; thirty potential sites were reviewed, and a site within the East Omaha redevelopment area was finally selected.

---

1. See. *Monarch Chemical Works, Inc. v. Exon,* 452 F.Supp. 493 (D.Neb.1978), and an unpublished memorandum opinion issued by the District Court on February 12, 1979.

2. Under § 104(h)(3)(D) of the Federal Housing and Community Development Act, 42 U.S.C. § 5304(h)(3)(D), the recipient of funds under the Act must "assume the status of a responsible Federal official under the National Environmental Policy Act of 1969," and must "accept the jurisdiction of the Federal courts for the purpose of enforcement of his responsibilities as such an official."

The Nebraska Department of Corrections then entered into an agreement with the City of Omaha to acquire the tract of land, which extends from East 23rd Street on the west to East 27th Street on the east, and from Woodland Road on the south to "J" Avenue on the north. Under the agreement, the City was to acquire the land within the site from private landowners, with resale to the State. The City was authorized to use eminent domain to acquire the land if voluntary acquisition was not possible. The original redevelopment plan was thus altered in two ways: the acquisition of land owned by existing industry was authorized, and the use of eminent domain was accelerated.

Negotiated attempts to acquire land owned by Monarch within the prison site were then begun by the City. When Monarch refused to sell, eminent domain proceedings were commenced.[3]

On November 4, 1977, Monarch filed suit in federal district court, seeking to enjoin the construction of the prison project. Monarch contended that the decision to build the prison without the completion of a new EIS violated § 102 of NEPA, 42 U.S.C. § 4332, since the change from an industrial to an institutional use constituted a "changed circumstance" rendering the original EIS prepared for the East Omaha Redevelopment Plan inadequate.

A preliminary injunction was issued by the District Court on June 13, 1978. The court held that Monarch had standing to sue, and that the redevelopment of the East Omaha area by the City constituted a "major federal action" triggering the requirements of NEPA. *Monarch Chemical Works, Inc. v. Exon,* 452 F.Supp. 493, 501 (D.Neb.1978).[4] The court held that since the decision to construct a prison facility on the site varied from the original redevelopment plan, the City of Omaha "must make a bona fide evaluation of the sufficiency of the original EIS in light of the changed circumstances * * *, and must establish a suitable record for review purposes." *Id.* at 501. *See* 24 C.F.R. § 58.19 (1977).[5] No appeal from this order was taken.

---

3. Monarch challenged the power of the City to condemn its property in state court. On April 10, 1979, the Supreme Court of Nebraska held that although a City may use eminent domain to effectuate the redevelopment of a blighted area, such a taking must be in accordance with the redevelopment plan; and since the East Omaha Redevelopment Plan did not originally contemplate the taking of Monarch's land, that land could not be condemned by the City solely as an accommodation to the State. *See Monarch Chemical Works, Inc. v. City of Omaha,* 277 N.W.2d 423 (1979). Although this decision by the Nebraska Supreme Court may delay the condemnation of Monarch's land, we do not believe that it renders this case moot since the injuries to environmental interests which Monarch alleges go beyond the loss of this particular piece of its property, *see Monarch Chemical Works, Inc. v. Exon, supra* at 498–499, and we were informed at oral argument that the State is proceeding with the condemnation of Monarch's land.

4. The court held that the City's receipt of federal funds for the acquisition and clearing of land for the project and the partnership between the City and the State for the project's construction made the project a "major federal action;" and that this fact could not be evaded by the State's independent use of eminent domain. *Monarch Chemical Works, Inc. v. Exon, supra* at 501–502.

5. This regulation, which sets forth the environmental review procedures for the Community Development Block Grant Program, under the Federal Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq.,* provides:

(a) *Original or updated environmental review.* A project which is a continuation of a previously commenced activity or activities for which no environmental review or clearance has been completed or for which previously conducted environmental reviews are insufficient due to changed circumstances, including the availability of additional data or advances in technology, must be subjected to an original or updated environmental review under this Part. Such review shall be carried out with respect to the entire project to the extent that the entire project or portions of it could still be altered in light of environmental considerations.

\* \* \* \* \* \*

(c) *No new environmental review.* A project which is a continuation of a previously commenced activity or activities for which environmental review or clearance has been completed and for which circumstances, including the availability of additional data or advances in technology, have not changed significantly, requires no new environmental review or clearance by virtue of such

Pursuant to the order of the District Court, the City prepared an eleven-page "Written Statement," with fifteen exhibits, setting forth the reasons in support of its decision that the change from an industrial to an institutional use was not environmentally significant, and that no new environmental review was required. This "Written Statement" compared the construction of the prison facility with the construction of an industrial building, in the areas of compliance with local zoning regulations, amount of building coverage of the two proposed uses, the effect of both uses on the natural and human environment, the adequacy of sanitary sewers and transportation links for the proposed prison use, the effect of the prison construction on historic property, the effect of noise from Eppley Airfield on the prison and the effect of noise from the prison on adjacent land uses, and the effect of the prison on local air quality. The "Written Statement" concluded that the difference in environmental impact between construction of the prison and construction of private industry was minimal, with the institutional use having a lesser impact than an industrial building in four ecological categories. Copies of this "Written Statement" were sent to all local, state and federal agencies which received a copy of the original EIS. No response was received.

After the preparation of the "Written Statement," the appellees filed a motion in the District Court to dissolve the preliminary injunction against construction of the prison project which was then in effect. Monarch also filed a motion in the District Court, requesting permanent injunctive relief because of various alleged deficiencies in the environmental reassessment done by the City. Monarch alleged that the City's environmental reassessment failed to adequately address the environmental impact of the construction of the medium-minimum security facility, failed to address the impact of the surrounding environment on the inmates to be housed in the medium-minimum security facility and failed to address the environmental impact of a proposed work release center to be located near the medium-minimum security facility.

After a combined hearing on both motions, the District Court entered an order on February 12, 1979, vacating the preliminary injunction and denying Monarch's application for a permanent injunction. It held, in a lengthy memorandum opinion, that the City had met all of its federal environmental obligations. Monarch appeals, raising the various alleged deficiencies in the City's "Written Statement" that were raised in the District Court.

■ Before addressing Monarch's contentions, we set forth the standard for review of an agency's determination that a change in a project for which an EIS has been previously prepared is not a "significant" change requiring the preparation of a new or amended EIS. See 24 C.F.R. § 58.19 (1977). Since such a decision is very similar to an agency's threshold determination that a particular project does not "significantly affect[ ] the quality of the human environment" such as would require the preparation of an original EIS, see 42 U.S.C. § 4332(2)(C), we agree with the District Court that the same standard for review should be applied. See Monarch Chemical Works, Inc. v. Exon, supra at 500.

The standard for judicial review of an agency's threshold determination was set forth by this Court in Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314 (8th Cir. 1974) (en banc). In that case, we held that an agency's threshold decision as to whether NEPA requires the preparation of an EIS for a particular project should be reviewed on the grounds of its reasonableness. Id. at 1320. "To upset an agency determination not to prepare an impact statement, it * * * must be shown that the agency's determination was not reasonable under the circumstances. This will require a showing that the project

project's funding under Title I. The applicant shall prepare a written decision to that

effect, which shall set forth the reasons therefor.

could significantly affect the quality of the human environment." *Id.* *Accord, Monarch Chemical Works, Inc. v. Exon, supra* at 500. In the light of this standard, we will consider Monarch's contentions *seriatim.*

a. *Environmental Impacts of the Medium-Minimum Security Facility*

Monarch contends that the City's environmental assessment was inadequate because it failed to consider the impact of the proposed medium-minimum security facility on Monarch's operations. We disagree.

Monarch Chemical Works, Inc., is engaged in the asphalt supply and oil reprocessing business. The reprocessed oil which it produces is principally sold to railroads for use as a lubricant for freight car bearings and journal boxes.

In 1973, the EPA promulgated regulations requiring producers of petroleum products to prepare a spill prevention control plan. In early 1974, Monarch devised a spill prevention control plan which anticipated the acquisition of land which was adjacent to Monarch's reprocessing facility, and the building of storage tanks and a sump area, surrounded by a dike, thereon. To effectuate the plan, Monarch began to negotiate with the owners of the parcels of land in this area. It ran headlong into the efforts of appellees to acquire the same land for the correctional facility. The District Court found that, at the present time, about fifty percent of the land which Monarch desires to acquire is owned by the City; the remainder is owned by Monarch.

The State now seeks to acquire that piece of land owned by Monarch, on which Monarch had planned to locate the spill prevention control sump and dike. Monarch contends that if this land is taken for the correctional facility, it will be forced to close its plant because no other suitable land for the sump pumps exists. It contends that the forced closing of its plant is cognizable under NEPA because NEPA is concerned with changes in energy supply and demand, and the closing of its plant will diminish the national supply of reprocessed lubricating oil.

▮▮ Changes in energy supply and demand occasioned by a federal project may be cognizable under the broad reach of NEPA. *See Mobil Oil Corp. v. F. T. C.,* 430 F.Supp. 855, 862–863 (S.D.N.Y.), *rev'd on other grounds,* 562 F.2d 170 (2d Cir. 1977). *Cf. Jackson Cty., Mo. v. Jones,* 571 F.2d 1004, 1007 (8th Cir. 1978). Such changes must, however, be based upon more than the speculative chain of events described here. Most of the land which Monarch sought for its plan was owned by others, and the District Court found that "[e]ven if the State had chosen [another] location for the correctional facility * * *, there is no assurance that [Monarch] could have persuaded all of the landowners within the area to sell out." The District Court also pointed out that Monarch's planned land acquisition could have been as easily thwarted by the purchase of the same land by another industry under the original East Omaha Redevelopment Plan, as by the State's efforts to construct a prison facility. A number of streets and alleys owned by the City would have had to have been vacated before Monarch's plan could have been implemented. There was also evidence at trial that other land owned by Monarch might be suitable for its spill containment plan, albeit at greater cost. NEPA does not require the consideration of such a remote and speculative chain of events. *See Environmental Defense Fund, Inc. v. Hoffman,* 566 F.2d 1060, 1067 (8th Cir. 1977); *Environmental Defense Fund, Inc. v. Stamm,* 430 F.Supp. 664, 667 (N.D. Cal.1977).

Monarch next contends that the City's environmental assessment was deficient because the City failed to discuss alternative sites for the location of the medium-minimum security institution. *See* 42 U.S.C. § 4332(2)(E). This contention is without merit. Thirty sites were evaluated by the State before the site in East Omaha was selected. We agree with the District Court that, under these circumstances, no useful purpose would be served in requiring the City to again assess these alternatives.

Monarch also contends that the cost-benefit analysis conducted by the City is insuffi-

cient to meet the requirements of NEPA. We have reviewed the City's "Written Statement" and the original EIS, and find this contention to be without merit.

We have reviewed Monarch's other contentions as to the alleged environmental impact of the medium-minimum security facility and find them to be similarly without merit.

b. *Impact of the Environment on the Residents of the Medium-Minimum Security Facility*

Monarch next contends that the City's environmental assessment was inadequate because it failed to adequately address the issue of the impact of noise from Eppley Airfield on the inmates who will be confined in the medium-minimum security facility. It contends that the City's assessment was inadequate because it utilized the "ASDS" method of noise measurement which Monarch contends is now obsolete, and because it failed to take into account the expansion and instrumentation of Runway 17–35, with concomitant lengthening of the clear zone and noise corridor.

■ Whether NEPA requires the consideration of the impact of the surrounding environment upon the human beings to be placed in a federal project is a subject of some debate. *Compare Chelsea Neighborh'd Ass'ns v. United States Post. Serv.*, 516 F.2d 378, 388 (2d Cir. 1975), *with Clinton Community Hosp. Corp. v. Southern Md. Med. Ctr.*, 374 F.Supp. 450, 457 (D.Md. 1974), *aff'd*, 510 F.2d 1037 (4th Cir.), *cert. denied*, 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975). Assuming that NEPA requires the consideration of such "reverse impacts," it is apparent that both the City and the State were aware of the problem of noise pollution from Eppley Airfield, and that the effect of noise upon inmates and staff of the correctional facility was assessed. The City's "Written Statement" acknowledges that aircraft noise from Eppley Airfield "creates a degree of irritation," but states that the noise assessment, which was a part of the original EIS, indicates that the

noise is within the guidelines for acceptable noise threshold levels for residential use as defined by HUD and OSHA, and that the architectural plans for the buildings, which have been proposed by the Department of Corrections, are designed to minimize the effect of exterior sound. "Reasonable notice of the environmental consequences was clearly given and the decisionmakers [had] sufficient information to aid in their substantive decision whether to proceed with the project in light of its environmental consequences." *Sierra Club v. Froehlke*, 534 F.2d 1289, 1296 (8th Cir. 1976). *See also Environmental Defense Fund, Inc. v. Hoffman, supra* at 1069–1070.

■ Nor, in our view, is the noise assessment inadequate because it was based on the "ASDS" method of noise measurement. There was testimony at trial that this method of noise measurement, which was used in the original EIS, has been replaced by a more precise "LDN" method of noise measurement, and that a study of noise generated by Eppley Airfield is now being done using the "LDN" method.[6] Decision makers are not required, under NEPA, to wait for the completion of studies by other agencies before a major federal action may be undertaken. *See Environmental Defense Fund, Inc. v. Hoffman, supra* at 1068; *Sierra Club v. Froehlke, supra* at 1296, n. 25. To hold otherwise would be to forestall projects indefinitely, pending the completion of potentially more complete or more accurate scientific studies. *See Environmental Defense Fund, Inc. v. Hoffman, supra.* The original EIS prepared in this case contained an extensive discussion of the noise pollution issue and, thus, the decision of the City and the State to proceed before completion of the additional study was not unreasonable. *Id.*

■ We also believe that the City and State adequately considered the proposed extension of Runway 17–35, and its implications on the need for an expanded clear zone. Greg Peterson, of the Omaha City Planning Department, testified that the extension of Runway 17–35 was considered by

6. Testimony at trial indicated that the estimated date of completion for this study was May, 1979. We have received no indication, however, that this study is now complete.

the City, and that the facility was planned so that no inmates would be housed within the clear zone. Although Peterson testified that he was not aware of the proposed instrumentation of the runway, Ronald Greer, Executive Director of the Omaha Airport Authority, testified that plans for the instrumentation of this runway and the resultant need for an expanded clear zone were submitted to the Department of Corrections in 1975. An employee of the consulting firm which assisted the State in the planning of the facility testified that the clear zone for the ultimate expansion of the runway was taken into consideration. The failure of the City to explicitly discuss the proposed instrumentation of the runway in its "Written Statement" is not fatal since the reasonableness of an agency's threshold determination of the environmental significance of a proposed federal action must be assessed in light of the entire record, and is not limited to the specific language of the formal assessment which has been prepared. *See City of New Haven v. Chandler,* 446 F.Supp. 925, 933 (D.Conn.1978). *Cf. Environmental Defense Fund, Inc. v. Hoffman, supra* at 1069–1070.

■ The existence of both noise and air pollution in the East Omaha area might render this area less than desirable for the construction of a correctional facility; such disadvantages must, however, be weighed against the advantages of such a site, including its accessibility to the family and friends of inmates confined there. In any event, our task is not to substitute our judgment for that of the planning agencies, but rather to review the reasonableness of the City's determination that the original EIS, which it prepared, adequately reflects the competing environmental values involved in the construction of the correctional facility. We cannot say that these issues were not adequately addressed in the original EIS, and that the City's determination that a new EIS was not required was unreasonable.

c. *Environmental Impact of the Proposed Work Release Center*

Monarch next contends that the City's environmental assessment was inadequate because it did not include a consideration of the environmental consequences of a work release center, which has been proposed for construction in the Omaha area. The appellees respond, and the District Court held, that no assessment of the work release center is required because location of the center, and its architectural details, are not yet formulated. We agree.

■ In *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the Supreme Court addressed the issue as to when an agency is required by § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), to have an environmental assessment of a particular project prepared. The Court, citing *Aberdeen & Rockfish R. Co. v. SCRAP,* 422 U.S. 289, 320, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), stated that "the moment at which an agency must have a final statement ready 'is the time at which it makes a recommendation or report on a *proposal* for federal action.'" 427 U.S. at 406, 96 S.Ct. at 2728. The mere "contemplation of a project and the accompanying study thereof do not necessarily result in a proposal for major federal action * * *." *Id.* The administrative decisionmaking process must be of sufficient maturity before a judicially enforceable duty to prepare an environmental assessment of a proposed project exists. *Id.* & n. 15. To require the preparation of an environmental assessment at an earlier point would be to invite judicial involvement in the day-to-day decision-making process of an agency, and to require the preparation of unnecessary impact statements. *Id.*

■ We agree with the District Court that the work release center proposal has not reached sufficient maturity to require its inclusion in the City's environmental assessment. At the time that the City's "Written Statement" was prepared, no plans for the work release center existed. A program statement analyzing the need for such a facility, and containing suggestions for meeting that need, was completed in August of 1978. No concrete architec-

tural plans or other detailed planning, however, has been cited either to the District Court or to us. Although the Nebraska Legislature has appropriated funds for the construction of the center, and the center will apparently be located in the Omaha area, no specific site has yet been selected.[7] In the absence of more definitive planning, the environmental impact of the center would be difficult to determine. We do not believe that the City's refusal to complete an environmental assessment of the work release center under these circumstances was unreasonable. *See Sierra Club v. Froehlke, supra* at 1297.[8]

The judgment of the District Court is affirmed.

---

7. The State informed us during oral argument that L.B. 593, passed by the 86th Nebraska Legislature on May 11, 1979, provided that the work release center is to be built "in Omaha," without further site designation.

8. We note that even if the work release center proposal becomes sufficiently definitive as to require review of its environmental impact, the halting of that project pending its environmental assessment would not require the halting of construction of the medium-minimum security· facility as well. This is not a case where construction of the first project will result in the irretrievable commitment of resources toward the second. *See Sierra Club v. Froehlke,* 534 F.2d 1289, 1297–1298 (8th Cir. 1976); *Sierra Club v. Morton,* 169 U.S.App.D.C. 20, 51, 514 F.2d 856, 887 (1975), *rev'd sub nom. Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Nor, although location of the work release center near the medium-minimum security facility might be desirable, is there any evidence that each project is not a separate, viable entity, or that the first project is merely a component increment, or first segment of the second. *See Sierra Club v. Froehlke, supra* at 1298; *Sierra Club v. Callaway,* 499 F.2d 982, 990 (5th Cir. 1974).