**ARKANSAS NATURE ALLIANCE, INC., Plaintiff,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS; Colonel Benjamin Butler, District Engineer, Little Rock District, Corps of Engineers, Defendants.**

No. 1–02–CV00037–WRW.

United States District Court, E.D. Arkansas, Northern Division.

Feb. 14, 2003.

Richard H. Mays, Michelle Lee Davenport, Richard H. Mays Environmental Legal Services, Little Rock, AR, for Arkansas Nature Alliance, Inc., An Arkansas Not–For–Profit Corporation.

E. Fletcher Jackson, U.S. Attorney's Office, Eastern District of Arkansas, James W. Cullum, U.S. Army Corps of Engineers, Little Rock, AR, for Department of Defense, United States Army Corps of Engineers, Benjamin Butler, Colonel, District Engineer, Little Rock District Corps of Engineers.

## ORDER

WILSON, District Judge.

### I. Introduction:

I must determine whether Defendants, U.S. Army Corps of Engineers ("Corps"or "COE") and its District Director, have failed to comply with the National Environmental Policy Act ("NEPA") and its implementing regulations, in the issuance of Letter of Permission ("LOP") No. 01114–2, and in the issuance of Nationwide Permit ("NWP") No. 0111401. Implicit in that decision is the question of whether the Corps' decision on the permit application required either an environmental assessment (EA) or an environmental impact statement (EIS), or whether the application was one that could be issued under one of the "categorical exclusions" to NEPA, a Letter of Permission (LOP).[1]

The final agency actions in question were issued on January 22, 2001. The LOP authorized modifications to a previously permitted lowwater bridge on the White River to Landers Island. Landers Island had recently been purchased by Developers for a subdivision, Eagles Nest.[2] It was the application of the Developers which resulted in the agency actions questioned here, the issuance of the LOP and NMP which permitted bridge modification and bank stabilization in connection with the bridge improvement.[3]

Defendants' Motion for Summary Judgment[4] and Plaintiff's Motion for Summary Judgment are pending.[5] I have reviewed the parties supporting motions and briefs, heard oral arguments, reviewed post argument briefs, Friend of Court Briefs submitted by the permit applicants, and the voluminous administrative record. Additionally, letter briefs were requested, reviewed, and made part of the record.

Defendants argue it was proper for the Corps to use one of the "categorical exclusions" to the NEPA requirement mandating either an environmental assessment ("EA") or an Environmental Impact Statement ("EIS"). Plaintiff argues that the abbreviated procedure violates statutory law, the regulations of the Corps, and its established procedures. Specifically, Plaintiff's position is that the procedures, findings, conclusions, and agency determinations that permitted the expansion and enlargement of the bridge (for the purpose of placing buildings, septic tanks and field lines on the shores of the White River, where these items are subject to being washed away by floods, and where the bridge constitutes a threat to navigation) are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. For the reasons set forth in this Order, Plaintiff's Motion for Summary Judgment is **GRANTED** with some modification with respect to the relief requested.

---

1. 33 C.F.R. § 325.2(a)(4).

2. Docket No. 32, Earnest F. Lamb, III; David Sharp; Dennis Wilson; and Tony Stewart have been identified as the developers by their lawyer. They will be referred to as "Developers".

3. Administrative Record ("AR") at 35.

4. Doc. No. 9.

5. Docket No. 14

## II. The Parties and Major Actors:

Plaintiff, Arkansas Nature Alliance, Inc., ("ANA") is a nonprofit corporation organized and existing under the laws of the State of Arkansas. The purpose of the organization is to protect and preserve the water, air, soils, scenic beauty, animal and aquatic species and habitat; to identify and educate the public with threatened resources; to take action to protect, preserve, and enhance those resources; and to preserve all other aspects of the White River. Members of the ANA live in the immediate area of the White River or have traveled there. All members of the ANA have enjoyed, and continue to enjoy, substantial benefit and enjoyment from the White River and its environment by participating in fishing, hunting, boating, photographing, and other outdoor activities.

Defendant, United States Army Corps of Engineers, is the agency within the U.S. Army which has been assigned the responsibility by the Department of the Army, for management of various rivers, lakes, and other water resources of this country. In that role, the Corps is responsible for the issuance, modification, and revocation of permits relative to various activities taken, or proposed to be taken, on waters and tributaries, including the White River.

Individual Defendant, Colonel Butler, is a district engineer in the Little Rock District, and is a party in his official capacity. The White River, which the lowwater bridge crosses, is at the center of this dispute. It is a water resource overseen and managed by the Little Rock District of the Corps. In the management of the district, Butler has the authority to issue the permits, which are the subject of this litigation.

J.W. Dobbins was the original owner of Landers Island. On March 3, 1978, he applied for a permit to smooth the top of an existing lowwater ramp adjacent to Landers Island. The application indicated that the existing ramp would not be raised more than four inches. The drawing attached to the Administrative Record shows that the lowwater ramp would be (100) feet long and (4) feet wide.[6]

Earnest (Trey) Lamb, III, and three partners ("The Developers") purchased Landers Island, together with certain other nearby property, on or about October 19, 2000.[7] The Developers intend to create a subdivision with Lots 1–49, known as Eagles Landing, on the island.[8]

On October 12, 2002, the Developers applied to the Corps for a permit to raise and rebuild the lowwater crossing adjacent to Landers Island.[9]

Although the Developers, who might be affected by the ruling, were not parties to the original lawsuit, I invited them to retain counsel and to file a Friend of the Court Brief.[10] The Developers obtained counsel. Although they did not intervene at the first invitation, they filed a Friend of the Court Brief on September 24, 2002. After receiving additional briefs on remedial issues, on December 20, 2002, the Developers, filed a motion to intervene. That motion is decided later in this Order.

## III. The Landscape:

The White River is one of Arkansas's valuable water resources for drinking water, fishing, wildlife habitat, irrigation, and

---

6. AR 115.

7. Docket No. 32, Letter to Court from lawyer for Developers, dated 1/10/03; Aff. Lamb, Exhibit A to Friend of Court Brief.

8. Aff. Lamb.

9. AR 81.

10. Doc. No. 18., Order September 10, 2002.

recreation. The White River is highly prized and valued not only by people of Arkansas but also by outdoor enthusiasts across the United States. It is located principally in North Arkansas, entering the state as a tail water of Bull Shoals Lake and Dam. It is considered a "navigable water" within the meaning of the Clean Water Act, and a "navigable water of the United States" within the meaning of Sections 10 and 13 of the Rivers and Harbors Act of 1899. As a "navigable water" as defined by the Clean Water Act, the dredging, filling, and other human activities that may affect the water quality, flow, navigation and general environment of the White River are regulated by the Corps under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403 *et seq.*, among other authorities.

Landers Island, on the White River, runs generally in a northwest-southeast direction, and is approximately 1,400 feet long and approximately 300 feet wide at its widest point.[11] The White River is subject to rapid and extreme fluctuations of water levels. As a result, Landers Island, and the bridge that is the subject of this lawsuit, lie in the 100–year flood plain of the River. The Island has, on occasion, been partially or wholly flooded. According to Corps calculations contained in the Administrative Record for the permit, the New Bridge has a ninety percent (90%) probability of being inundated by high water each year.[12]

The Bridge to Landers Island, or rather the New Bridge, is at the heart of this case. This New Bridge results from a final agency action of the Corps taken on or about January 22, 2001. Specifically, the final agency action granted the applicant Developers a Letter of Permission (LOP) authorizing the reconstruction of the lowwater bridge[13] and Nationwide Permit NWP, permitting the placement of fill materials into the White River at mile 346.1 in Stone County, Arkansas, for the enlargement of a previously existing bridge. This LOP was issued under a categorical exclusion of NEPA,[14] which would have otherwise required an EIS.

Construction of "Eagles Landing Subdivision" is currently underway on the island. The Developers have plotted 49 lots on the Island, and an additional five lots on the west shore of the western channel of the White River.[15] Eagles Nest consists of single family residences, to be serviced by septic tanks.[16]

Mountain View, with a population just under 3,000, is the town nearest to the Island and uses the White River as the sole source of its municipal drinking water system. The intake pipe for the Mountain View drinking water system is located six (6) miles downstream from Landers Island.[17]

IV. **The History of the Island and Bridge:**

The history of Landers Island, its use, and the prior permit process for the original bridge to the island are relevant to this case. The record reflects that on March 3, 1978, J.W. Dobbins applied for a permit to smooth the top of a ramp that had been existing for 30 years. The purpose was to

11. Doc. No. 6 at ¶ 11; AR 67 and 140.

12. AR 50 and 156.

13. AR 36.

14. 33 C.F.R. Part 325, Appendix B, § 6.

15. AR 11.

16. AR 165.

17. Doc. No. 1.

make it easier to cross with farm equipment.[18] After public notice and administrative review, on June 28, 1978, the Corps issued the permit "to surface with concrete an existing lowwater bridge joining his property and a small island known as Landers Island which he also owns."[19] At that time, the lowwater bridge was a rock structure approximately 100 feet in length and approximately four (4) feet in height from the bottom of the river channel concrete surface (including the concrete added by Dobbins).[20] The lowwater bridge did not present an obstruction to navigation or water flow through the west channel of the White River along the island.

On October 16, 2001, the Developers' application to the Corps sought "to improve, raise and rebuild the bridge in order to provide two lane accesses to Eagles Landing Subdivision."[21] On January 22, 2001, the COE issued a LOP authorizing the placement of dredged and fill material in waters of the United Stated associated with the improvement of an existing, previously permitted, lowwater bridge and the accompanying bank stabilization. The LOP allows a lowwater bridge approximately 150 feet long, 18 feet wide at the top and 36 feet wide at its base.[22]

The LOP was issued with both general and specific conditions. Both are important to my findings. The special conditions are particularly relevant to the remedy. Of considerable importance is the special condition the Corps placed on the Developers regarding flood warnings. The condition stated, "You shall place signs on both ends of the bridge that are clearly visible at all times. The signs shall inform the public that the bridge across the river is subject to flooding during high flows."[23]

Another condition relevant to the remedy states:

> The permittee understands and agrees that, if future operations by the United States require the removal, relocation, or other alteration, of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army or his authorized representative, said structure or work shall cause unreasonable obstruction to the free navigation of the navigable waters, the permittee will be required, upon due notice from the Corps of Engineers, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States.[24]

The New Bridge is now complete. There is no dispute that it was not constructed in accordance with the plans. Following complaints about the size and nature of the work, inspection revealed that the crossing was built three (3) feet higher than the permit authorized. While the Developers wanted to keep the crossing at that elevation to make it safer, the Corps explained: (1) the crossing needed to be lowered to the elevation that was requested and authorized in the permit; and (2) there was no excuse for this type of violation, and if existing culverts became blocked during a flooding event, the crossing would act as a dam and could have

18. Doc. No. 115

19. Permit No. W–ND–050–03–1114; AR 35.

20. AR 115.

21. Ar. 84 COE Action No. W–ND–050–03–1114

22. Doc. No. 6 at ¶ 37.

23. AR 36.

24. AR 36.

serious adverse effects downstream.[25]

The effects of the new bridge and its impact on the navigation, landscape, and water supply created by the White River are central to this lawsuit and form the underpinnings of Plaintiff's complaint.

## V. Jurisdiction:

The Letter of Permission (LOP) was issued under the provisions of Section 10 of the Rivers and Harbors Act of 1899 [26] and Section 404 of the Clean Water Act.[27]

The Plaintiff seeks declaratory and injunctive relief against the Corps for failure to comply with NEPA [28] and its implementing regulations ("CEQ Regulations") and the requirements of Section 13 of the Rivers and Harbors Act of 1899.[29]

The parties have agreed that this Court has jurisdiction pursuant to the Administrative Procedure Act.[30]

## VI. Procedural Status of the Case:

On April 9, 2002, Plaintiff filed a complaint seeking declaratory and injunctive relief against the Corps for its failure to comply with NEPA,[31] the implementing regulation for NEPA issued by the White House Council on Environmental Quality to implement NEPA,[32] regulations issued by the Corps relative to the issuance of permits for the action in question here,[33] and the requirements of Section 13 of the Rivers and Harbors Act of 1899.[34]

In the complaint, Plaintiff alleges that the permit issued for the New Bridge is invalid—contrary to statutory law; improperly issued in violation of the Corps' own regulations; invalid because the NWP 13 is not applicable to, nor does it authorize the work performed at Landers Island; and, that the LOP issued pursuant to a categorical exclusion to NEPA violates both statutory and regulatory standards. Further, Plaintiff alleges that the Developers failed to comply with the LOP as issued.

On June 21, 2002, Defendants filed a Motion for Summary Judgment. On July 22, 2002, Plaintiff responded and filed a Counter Motion for Summary Judgment. Both parties filed briefs to support their Motions.

The entire Administrative Record was filed by Defendants on June 6, 2002. On September 10, 2002, I held a hearing and heard the parties' arguments on both the Summary Judgment Motions. In reviewing the motions, I am required to review the facts in a light most favorable to the nonmoving party.[35]

## VII. Governing Legal Standards:

■■■■■ It is firmly established that I am confined to the administrative record in deciding this case.[36] I may not substitute my judgment for that of the agency, but must studiously review the record to en-

---

25. AR 19.

26. 33 U.S.C. § 403.

27. Federal Water Pollution Control Act (CWA) § 404, 33 U.S.C. § 1344.

28. 42 U.S.C. §§ 4321–4370(a).

29. 33 U.S.C. § 407.

30. 5 U.S.C. § 701.

31. 42 U.S.C. §§ 4321–4370(a).

32. 40 C.F.R. §§ 1500–08.

33. 33 C.F.R. Part 325.

34. 33 U.S.C. § 407.

35. *Naucke v. City of Park Hills,* 284 F.3d 923, 927 (8th Cir.2002).

36. *Arkla Exploration Co., v. Texas Oil & Gas Corp.,* 734 F.2d 347, 357 (8th Cir.1984)

sure the agency has arrived at a reasoned judgment based on a consideration and application of the relevant factors.[37] Where conflicting evidence is before the agency, it is the agency, and not I, that has the discretion to accept or reject the evidence from several sources.[38] However, I am not required to rubber stamp agency action. To the contrary, I am required to make a meaningful review of an agency action to ensure that decisions are founded on a reasoned evaluation of relevant factors and did not make clear errors of judgment. When faced with the narrow question of whether or not it was necessary to supplement an EIS, the Supreme Court stated: [39]

> [C]ourts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information. A contrary decision would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation of relevant facts.

Section 102(2)(c) of NEPA, requires that the relevant federal agency—here the Corps—prepare an EIS for "major federal actions affecting the quality of the human environment." [40] Initially, the agency determines whether the proposed action triggers the EIS requirement.

■ At oral argument, both parties relied on *Winnebago Tribe of Nebraska v. Ray*.[41] My tenure on the bench and at the bar has taught me to be particularly careful when both parties rely so heavily on the same case. I have studied it, however, and believe that it does set forth the standards and burdens which I must use to review this record. Specifically, it teaches that to upset an agency determination to not prepare an EIS, it must be shown that the agency's determination was not reasonable under the circumstances.[42] This requires Plaintiff to show that the project could significantly affect the quality of human environment.[43] Thus, my review of an agency's decision not to prepare an impact statement must be measured by its reasonableness in the circumstances, not as to whether it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.[44]

Here, I must apply standards in reviewing the administrative record to decide whether it was appropriate for the Corps to permit the modification of the lowwater bridge in the circumstances of this case—under a categorical exclusion of NEPA. This categorical exclusion allowed the project to proceed without a permit pursuant

---

**37.** *Sierra Club v. Davies,* 955 F.2d 1188,1198 (8th Cir.1992)

**38.** *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)(reversed on different grounds)see also *First National Bank of Fayetteville v. Smith,*508 F.2d 1371,1378(8th Cir.1974)

**39.** *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, & n. 9, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); See Also, *Audubon Society of Central Arkansas v. Dailey, et al.,* 977 F.2d 428, 434 (8th Cir.1992).

**40.** 42 U.S.C. § 4332(2)(C).

**41.** 621 F.2d 269 (8th Cir.1980).

**42.** *Id.*

**43.** *Id.* at 271 (citing *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 466 (5th Cir.1973)).

**44.** *Id.* (citing *Monarch Chemical Works, Inc. v. Thone,* 604 F.2d 1083, 1087–88 (8th Cir. 1979)).

to an abbreviated LOP[45] process which does not require an EIS, public notice, or hearing.

For Plaintiff to prevail in an attack on a Corps final determination, Plaintiff must raise a substantial environmental issue concerning the proposed project, and then the burden shifts to the defendant to support the reasonableness of the decision to forgo the NEPA inquiry.[46] Cases where the substantive decision of whether or not to proceed with a project after the agency has prepared an adequate EIS must be reviewed to determine whether the decision was arbitrary and capricious. However, in this case, I only have before me the question of whether the threshold decision of whether to proceed without preparation an EIS is reasonable.[47]

On this record, I find that Plaintiff has met its burden and that the decision of the Corps not to prepare an EIS and ignore NEPA was not reasonable. Even if it were necessary to find that the decision was arbitrary and capricious, on this record, I would.

## VIII. The Use of the Categorical Exclusion:

█ The Corps' regulations require that the district engineer follow environmental procedures and documentation required by NEPA. A decision on a permit application requires either an environmental assessment or an environmental impact statement *"unless it is included within a categorical exclusion."* [48]

"Categorical exclusions" are discussed in the Corps' NEPA implementing regulations.[49] Subsection (a) states:

Even though an EA or EIS is not legally mandated for any Federal action falling within one of the "categorical exclusions," that fact does not exempt any Federal action from procedural or substantive compliance with any other Federal law ... The following activities are *not* considered to be major Federal actions significantly affecting the quality of the human environment and are therefore categorically excluded from NEPA documentation:

1. Fixed or floating small private piers, small docks, boat hoists and boathouses;

2. Minor utility distribution and collection lines including irrigation;

3. Minor maintenance dredging using existing disposal sites;

4. Boat launching ramps;[and]

5. *All applications which qualify as letters of permission (as described at 33 C.F.R. 325.5(b)(2)).* [50]

The activities of the first four exclusions are individual and non-intrusive. The repetitive use of the words "small and minor" indicates the limited impact expected by the activity allowing for categorical exclusion. Obviously, the Corps drafters intended the categorical exclusions, including the "letter of permission," to cover the same types of non-intrusive projects, and did not expect them to include one of this magnitude.

The regulations providing the criteria for the issuance of a letter of permission are instructive. They provide:

---

45. 33 C.F.R. Part 325, Appendix B, § 6.

46. *Winnebago,* 621 F.2d at 271.

47. *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314 (8th Cir.1974).

48. 33 C.F.R. § 325.2(a)(4) (emphasis added).

49. 33 C.F.R. Part 325, Appendix B, § 6.

50. *Id.* (emphasis added).

Letter of Permission. A letter of permission will be issued where procedures of paragraph 325.2(e)(1) have been followed. It will be in a letter form and will identify the permittee, the authorized work and location of the work, the statutory authority, any limitations on the work, a construction time limit and a requirement for a report of completed work. A copy of the relevant general conditions from ENG Form 1721 will be attached and incorporated into the letter of permission.[51]

Clearly the letter will issue only when the procedures of paragraph 325.2(e)(1) have been followed. Those procedures state:

(e) Alternative procedures. Division and district engineers are authorized to use alternative procedures as follows:

(1) Letters of Permission. Letters of permission are a type of permit issued through an abbreviated processing procedure which includes coordination with Federal and State fish and wildlife agencies, as required by the Fish and Wildlife Coordination Act, and a public interest evaluation, but without the publishing of an individual public notice ... Letters of permission may be used:

(i) In those cases subject to section 10 of the Rivers and Harbors Act of 1899 when, in the opinion of the district engineer, *the proposed work would be minor, would not have significant or cumulative impacts on environmental values, and should encounter no appreciable opposition.*[52]

After careful examination of this record, I find that the approved action was not minor, that the potential of cumulative impact on the environment existed at the time the permit was issued, that the possibility of cumulative impact was admitted in the record and ignored by the Corps, and, that the Corps either knew, or should have known, that the proposed development would encounter appreciable opposition. Additionally, I find that the Corps violated its own regulations.

The New Bridge is twice as large as the other. This alone could suggest it is unreasonable to determine the modification to the bridge was minor. The permit to change the size of the bridge was also intended to change the purpose of the bridge from a low-water, cattle and farm-machinery crossing, to the means of ingress and egress to a 49–lot subdivision.

I cannot ignore the opposition at the time of the permit and some members of the public were requesting notice. This area of the White River is one of the most attractive trout fishing areas in the United States. The record reflects, the Corps either knew or should have known that there would be appreciable opposition. Again, I find the Corps' assumption that the proposed action would encounter no appreciable opposition is unreasonable.[53]

▮ Before visiting in detail the questions of whether the work was minor, would have significant or cumulative impacts on the environmental values, and encounter no appreciable opposition, I think it is instructive to look further at the Corps' regulations on the use of these categorical exclusions. Subsection 6(b) of Appendix B provides:

---

**51.** 33 C.F.R. § 325.5(b)(2).

**52.** 33 C.F.R. § 325(e)(1) (emphasis added).

**53.** AR 55, 62, 73, 74, 75,

Extraordinary Circumstances. District Engineers should be alert for extraordinary circumstances where normally excluded actions could have substantial environmental effects and thus require an EA or EIS.[54]

It seems pretty plain that when there is not a bright line for whether a project can be handled by "categorical exclusion," District Engineers should raise their "environmental sensitivity" and err on the side of performing an EIS, particularly when the proposed action could have substantial environmental effects.

Of the ten factors set forth in 40 C.F.R. § 1508(b) which are to be considered in evaluation of "intensity," factors 1, 2, 3, 4, 5, and 7 seem particularly relevant here:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involves unique or unknown risks.

\* \* \* \* \* \*

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.[55]

With those caveats in mind, I note again that the administrative record reveals that this modification allowed by the LOP increased the length of the bridge by 50 feet, added an additional three (3) feet in height, and increased the base width of the bridge to approximately 30 feet, more than doubling the size of the original structure.[56] The New Bridge is located in a flood plain and has resulted in a change of flow patterns of the White River, including increased erosion and "siltation".[56] Persons using the bridge and structures on Landers Island are endangered because the water is unpredictable in its potential for flooding.

It appears that portions of the bridge will be covered by water at least nine (9) days of every year, based on conservative calculations.[57] A "ten year flood" would cover approximately one-third of Landers Island, and the entire Island will be completely covered by flood waters at least once every 50 years; and, in fact, the entire island has apparently been covered with flood waters in the past.[58]

I have compared the analysis of the state agency comments for the 1978 permit application with the present one. The 1978 permit application reflects that the Corps had reasoned comments from all of the State agencies and had carefully con-

54. 33 C.F.R. § 325, Appendix B, § 6(b).

55. 40 C.F.R. § 1508.27(b)(1)-(5) and (7).

56. AR 61 and 115.

57. AR 49 and 156.

58. AR 8, 19, 39, and 68.

sidered them and other environmental concerns before granting the permit.[59]

This record does not even include information from all of the necessary state agencies and further reflects that, when there was comment, it was incomplete, ignored, or, at best, not appropriately heeded. For example, the Hydraulics Section expressed a concern for the safety of individuals using the lowwater bridge during high flows.[60] Ms. Perser, the Corps' evaluator determined that it could be appropriately remedied with a mere requirement of signs to inform the public of a potential hazard during high flows. The assessment sheet demonstrates adverse impact in the effect on public safety and water quality,[61] and, importantly, finds that the potential for multiple boat dock applications associated with the development of Landers Island "will *probably not* have cumulative effects." [62] This *equivocal* finding of cumulative effects is not the bright line that allows the Corps to move to "categorical exclusion," but, rather, should cause movement in the other direction.

Further evidence of inadequate attention to the requisite state agencies necessary in a LOP procedure is demonstrated in a letter from the Governor's office stating that the Arkansas Game and Fish Commission ("AGFC") had encouraged officials to carefully consider the impact of this project on trout and the river. The letter indicated that the Arkansas Department of Environmental Quality ("ADEQ") advised that the Developers had failed to get a storm water construction permit and

that ADEQ had additional concerns since the development has only 49 lots—*one lot* short of falling under the ADEQ's jurisdiction for septic tank issues. The Health Department's jurisdiction goes only to whether the soil is appropriate for use and not to the impact of flooding on water quality.[63] This is a far cry from the State's blessing of the project and is certainly not the kind of record that leaves one comfortable that there has been a determination that flooding on the development will have no impact on the municipal drinking water of the city of Mountain View, Arkansas, when the intake pipe is located only six miles downstream.

The Public Safety issue is not one that can be taken lightly. In fact, at the request of concerned citizens, the Corps conducted an after-the-fact, on-site inspection and found that the signs warning the public of the flooding danger were down. The inspection also revealed that one of the culverts was completely closed and a second culvert was partially clogged.[64]

The New Bridge expansion installed culverts through the bridge that clog with logs and debris.[65] This causes water back up on adjacent landowners and flooding and erosion of other channels of the river.[66] Navigation on the channel during normal water levels has been cut off by the height increase in the bridge while navigation was previously possible except for when the river was extremely low.[67] A fringe of wetlands is located on the island.[68]

59. AR 100–05, 108–10, and 112.

60. AR 43.

61. AR 43.

62. AR 44.

63. AR 163.

64. AR 128.

65. AR 19 and 128.

66. AR 15, 128, 189, 190, and 192.

67. AR 8, 103, 210.

68. AR 68.

There is additional support for the proposition that the modification will have significant, cumulative environmental effects resulting from further development on Landers Island for human habitation. For example, septic tank sewage systems, roads, electrical lines, boat docks, fences, and use of pesticides and herbicides. It cannot be gainsaid that these developments could cumulatively affect the water quality of the river, a source of drinking water.[69]

■ In determining whether a proposed action is major and significant, courts have begun to look at a project, not in terms of its size or the amount of its expenditures, but more in terms of the possible effects the project could have on the environment.[70] Based on the administrative record, the criteria established in the Code of Federal Register, and existing case law, I find that the action of the Corps constituted a major federal action "significantly" affecting the quality of the human environment, subjecting it to the requirements of NEPA. In passing NEPA, Congress recognized:

> [T]he profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth...and recogniz[ed] further the critical importance of restoring and maintaining environmental quality of the overall welfare and development of man...it is the continuing policy of the Federal Government...to use all practicable means and measures...to create

and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.[71]

The Corps has ignored this mandate. It has violated both statutory law and its own regulations.

■ I turn now to the issue of public interest in the project. Public interest and opposition to a proposed permit are important factors in determining whether a LOP is permissible. The term "appreciable" is defined by general usage as "capable of being perceived or measured."[72] I find that the Corps could not, on this record, reasonably perceive that this action would not have appreciable opposition. In fact, the Corps had actual notice of interest and opposition to the permit.[73]

Beginning in November of 2000, immediately after the October 16, 2000, application of the Developers, complaints were made by Jake Dobbins, who voiced strong opposition to the application and contacted his congressman.[74] Congressman Berry contacted the COE on November 16, 2002, and voiced strong concerns;[75] Izard County Judge Eddie Cooper contacted the COE in his capacity as a private citizen, notifying the COE that "if work requires a permit and a public notice goes out, he wants to get a copy; will have comments."[76] Lengthy objections to the development of Landers Island and health and safety issues were sent by Curtis Fes-

69. AR 44–45.

70. *City of Davis v. Coleman,* 521 F.2d 661, 673 n. 15 (9th Cir.1975).

71. 42 U.S.C. § 4331.

72. Merriam–Webster's College Dictionary, 10th Ed.

73. AR 71 and 73–74.

74. AR 56.

75. AR 56.

76. AR 62.

ler.[77] These communications, expressing interest and opposition, occurred *before* the permit was issued and when no public notice had been given. The COE was clearly on notice that appreciable opposition to the project existed, but dodged public notice by issuing the LOP.

After becoming aware of the permit application and its approval, the public became more active in voicing its complaints and concerns.[78] The Corps acknowledges these other letters, e-mails, and contacts which make up a good deal of the administrative record opposing the bridge and subdivision, but dismisses them as "post approval." While those communications may have been "post approval," they clearly indicate that, if the Corps chosen the route of public notice, the opposition would have been considerable. In this case, the Corps cannot sidestep the notice provisions by claiming that it believed this action would encounter no appreciable opposition as required by its regulations.[79] On this record, that is simply not reasonable.

I find it significant that the Corps has offered no reasonable explanation for its decision to issue a LOP, rather than one of the more appropriate permits which would have provided greater environmental assessment and public notice. The only explanation offered for using the LOP procedure is that this action was a modification of an already permitted structure. This position is quite puzzling in view of the size of the bridge modification in both height and width, and the immeasurably greater effect on, not only navigation, but also the flow of water through the West Channel.[80]

Importantly, in March of 1978, when Dobbins applied for a permit to smooth the top of an existing lowwater ramp, the Corps did issue a public notice of the permit application on April 24, 1978. What changed?

I have already found that the project triggered NEPA requirements. The Corps' letter from Defendant Butler to Developer Lamb, dated September 17, 2001, discusses the flood frequency and states: "We strongly suggest that you advise anyone building on the island of the risks of flooding. We also suggest that you contact the Arkansas Department of Emergency Management for additional information in formulating notification/emergency action plans." [81] I find this an admission of impact, control and scope of authority.

The action proposed here is on the White River, a river considered a state treasure. As stated earlier, the Corps cannot dismiss the public outcry as "post approval." It violated its own regulations in failing to utilize a process that provided the public an opportunity to object. The Corps has not demonstrated that its actions were reasonable—to the contrary, the record establishes that they were unreasonable.[82]

## IX. The Jurisdiction of the Corps:

■ The Corps admits that it has jurisdiction of the White River as a navigable water under Section 10 of the Rivers and Harbors Act of 1899,[83] and Section 404 of the Clean Water Act.[84] It was this admitted jurisdiction under which the Corps ex-

---

77. AR 73.

78. AR 7, 8, 20, 28, 33, 138, 139, 154, 164, 166, 170, and 171.

79. 33 C.F.R. § 325.2(e)(1)(i).

80. AR 61 and 115.

81. AR 156.

82. *Winnebago*, 621 F.2d at 271.

83. 33 U.S.C. § 403.

84. 33 U.S.C. § 1344.

ercised its discretion to issue the LOP at the heart of this dispute.[85] However, in this litigation, the Corps' post lawsuit position is that navigable rivers are bounded by the Ordinary High Water Mark ("OHWM"), that the development at Landers Island is above the OHWM and not subject to these statutes, and that its scope of authority ends there.

The Corps argues here that, in determining whether its scope of analysis was only the bridge or the bridge and the Island, it looked to see if it had statutory or regulatory jurisdiction over the OHWM, where federal control would lie. It looked for wetlands to see if jurisdiction was there.[86] It looked for endangered species.[87] It found no federal financing to turn the development into a federal project, and, hence, claim its jurisdiction was limited. So, the Corps argues that because it had no regulatory authority on anything other than the bridge, its scope of review was limited to only the bridge.

The weakness of the Corps' argument that its scope of analysis of the environmental consequences of its actions is limited by its regulatory authority, reminds me of Abraham Lincoln's old recipe for Homeopathic Soup—" you boil the shadow of a pigeon that starved to death."

Nowhere is the fallacy of the argument more apparent than in its own NEPA implementing regulations. One such regulation states:

> The district engineer is considered to have control and responsibility for portions of the project beyond the limits of the Corps jurisdiction where the Federal Involvement is sufficient to turn essentially a private action into a Federal action. *These are cases in which the environmental consequences of the larger project are essentially products of the Corps permit action.*[88]

Additional regulatory support exists to show that the Corps' convenient limitation on its scope of analysis is invalid. The regulation states:

> For those activities that require a DA permit for a major portion of a shoreside facility, the scope of analysis should extend to upland portions of the facility. For example, a shipping terminal normally requires dredging, wharves, bulkheads, berthing areas and disposal of dredged material in order to function. Permits for such activities are normally considered sufficient Federal control and responsibility to warrant extending the scope of analysis to include the upland portions of the facility.[89]

Plaintiff claims that the situation before me is analogous to the one described in the above regulation because the development of Landers Island required permits for the bridge, for fill material around the edge of the island, for erosion control measures, and potentially for dredging sediment built up in the west channel of the river, as well as for permitting boat docks that the Corps anticipated would be developed. The Corps anticipated the effects could be cumulative. I find this analogy supported by fact and not controverted.

In finding that the Corps has "misunderstood" its "scope of analysis," I am persuaded by a letter dated November 17,

---

**85.** AR 35.

**86.** Executive Order No. 11,990, Protection of Wetlands, 22 Fed.Reg. 26,961 (May 24, 1977).

**87.** National Historic Preservation Act of 1966, 16 U.S.C. § 470, et seq.

**88.** 33 C.F.R. Part 325, Appendix B § 7(b)(2)(emphasis added).

**89.** 33 C.F.R. Part 325, Appendix B § 7(c).

2000, from the project manager to Mr. Lamb to the Developers requesting additional information. This letter, only one month after the application, reads in relevant part:

> Under the National Environmental Policy Act (NEPA), the Corps of Engineers is required by law to evaluate impacts to the overall project area. The island became part of the scope of analysis when it became apparent that the proposed project could not be completed without a permit for the crossing.[90]

I reject the Corps' argument that it does not have jurisdiction because the "scopes of analysis" included only the bridge, and not Landers Island—and I rely in good part on this admission. In fact, I find that this is an admission to the broader meaning of "scope of analysis" which Plaintiff has argued is the appropriate one.

Plaintiff asserts that the authority of the Corps to regulate areas in and affecting the navigable waters of the United States was extended by Section 10 of the Rivers and Harbors Act of 1899.[91] Therefore, the threshold question should be whether the scope of the Corps' review is to determine whether a proposed action affects the navigable waters of the United States. Additionally, Plaintiff asserts that the project is covered by NEPA and that an environmental impact statement was required.[92]

Here, the development of the island is essentially a product of Corps' permitting the bridge to reach the island. This must be reviewed for its environmental consequences. The bridge constitutes more than "merely a link" in a corridor-type project. It provides ingress and egress for the public to reach a subdivision which previously had been an uninhabited area. The housing development is in the immediate vicinity of the bridge and the development led to a much larger bridge which would allow motor vehicles regular access. This is a far from the occasional crossing by farm equipment. Finally, the bridge and the subdivision are located on the White River which is regulated by the Corps. Actions on the island will directly affect a United States water through increased boat docks, potential pollution, potential debris from flooding, untreated waste, chemicals, and increased sediment from construction on the island. The Corps' jurisdiction of White River, coupled with the factors set forth here, implicates jurisdiction from other federal regulatory agencies. Apparently, these factors were ignored—at least the administrative record is silent as to them.

I find that the Corps' post-November 17, 2000, denial of this "scope of analysis" is an attempt to excuse a most inadequate consideration of the environmental consequences of the action for which it had responsibility. I further find that the Corps has jurisdiction, if not regulatory, then under NEPA, to review the impact on the environment of both the bridge and the island. I find that the Corps failed to conduct the analysis required by NEPA, that it violated its own regulations, and that it ignored its responsibilities of public notice and the probability of appreciable public opposition. These decisions were violations of statutory law and regulations, and. were arbitrary and capricious.

## X. The Developers:

 The Developers were not parties to this lawsuit originally. At the hearing,

---

**90.** AR 72.

**91.** 33 U.S.C. § 403. *See United States v. Sexton Cove Estates, Inc.,* 526 F.2d 1293, 1299 (5th Cir.1976).

**92.** 42 U.S.C. § 4332(2)(C)(i).

on September 19, 2002, neither party asserted that the Developers were necessary parties. I was informed at the hearing of the name of the attorney who represented the Developers. On that same day, I entered an Order and directed the Clerk to send a copy to both Mr. Lamb and his counsel. The order stated: "Mr. Earnest F. Lamb III, the landowner/developer who may be affected by my ruling in this case, is invited but in no way required—to retain counsel and to file a Friend of the Court Brief." The Developers did not intervene at first, but did file a Friend of the Court Brief on September 24, 2002. Their brief raised two major points. I will address each point in turn.

First, the Developers point out that they have spent significant money in purchasing the island. I am sensitive to that—it bothers me considerably. However, they have cited no case which would allow me to ignore the federal law requiring compliance with NEPA. Congress has determined that neither the public, nor the environment, should bear the consequences of the Corps' failure to comply with statutory and regulatory requirements. It is important to note that the contract for the sale of the Island was entered into on or about October 19, 2000, and closed on or about January 2, 2001.[93] The LOP and NWP were not issued until a year later—January 22, 2001.[94] It is clear that the purchase of the land was not made in reliance on the LOP or any other type of permit or action by the Corps.

I cannot ignore either the general or special conditions of the permit.[95] I have mentioned before the permit agreement that any operation by the United States requiring removal, relocation or alteration shall be done by the permittee. In addition, the special conditions make clear that the Corps retained jurisdiction to reevaluate the permit decision: (1) in cases of failure to comply with the terms and conditions of the permit; (2) if the information provided in the application process proves to be incomplete; or (3) if new information surfaces which the office did not consider. Given these stringent conditions, and the open-ended modification and reconsideration provisions, the Developers were aware of their risk. Further, they are not necessary parties.

Second, the Friend of Court Brief filed by the Developers adopted the Corps' position that it did not have the authority to assess the environmental issues. To support that argument, the Developers address only the issue of potential problems resulting from the septic tanks to be used in the development, and argue that the regulation of the location, design, construction, and installation of septic tanks is a matter of state law and is delegated to the Arkansas Department of Health.[96] They argue that neither the Corps' process nor this litigation was the proper forum for consideration of that issue.[97] I have already rejected the argument that lack of regulatory jurisdiction relieved the Corps from its "scope of analysis" requirements. In any event, even if the Arkansas Health Department has determined that septic tanks are suitable, the Corps is not relieved of its responsibility to review the environmental consequences of all the materials, substances, chemicals, and other wastes caused by the use of those tanks on

93. Doc. No. 32, Letter to Court, 1–10–03 from John Scott lawyer for the Developers.

94. AR 35.

95. AR 36.

96. Ark.Code Ann. § 14–236–101 et seq.

97. Friend of Court Brief at 2.

the river. Again, the Corps never studied the issue.

■ In considering the remedial options, I asked the parties to provide letter briefs offering authority, or lack thereof, for the removal of the bridge. I once again extended the invitation to the Developers to brief the issue. The parties and the Developers did so on December 16, 2002. After reviewing the authority, I requested reply briefs and the parties replied on December 19, 2002. In their December 19, 2002 reply, the Developers argued that this case is different from those cases relied on by Plaintiff, because there was no proof here that the Developers failed to act in good faith, so the Court's equitable consideration should weigh the fact that the landowners had spent $40,000 to $50,000 on the bridge.

I am not prepared to find that the Developers acted in bad faith on this record, but there is evidence that the bridge was constructed three (3) feet higher than listed on the application, that the proper number of culverts was not inserted, that serious problems were caused by debris in the flow of the river from clogged culverts, and that, during inspection, the Corps ordered a cease and desist until the violations were remedied. There is no evidence in this record of how much money the Developers expended to remedy their mistakes.

■ Finally, on December 22, 2002, the Developers filed a Motion to Intervene. Plaintiff has objected, for among other reasons, that the motion was untimely. Defendants have taken no position on the intervention.

I have reviewed the Developers' briefs and exhibits and find that none of the factual information provided by the Developers affects my liability ruling against the Corps. This case is different from the one relied on by the Developers in their argument against my remedial authority. In *Thompson v. Freeman*,[98] the Eighth Circuit reversed the lower Court because it ordered a nonparty to carry out its order. I have not done that here. Rather, I have allowed intervention of the Developers for remedial issues.

While I agree with Plaintiff that it is questionable whether the motion to intervene is timely, the remedy provides for minimal continued jurisdiction, and, of course, there is the possibility of appeal. I will, therefore, allow the intervention of the Developers in all further proceedings in which they have an interest. The Motion for Intervention is **GRANTED**. In other words, the Developers are now parties, subject to this and other orders.

## XI. The Remedy:

1. I find that the Corps' use of the " categorical exclusion", Letter of Permission No.01114–1, Nationwide Permit 01114–1, dated January 22, 2001, was not reasonable, and I order it revoked.

2. I order the Corps and the individual Defendant to address the original application under the full permit process regulations and NEPA regulations, which require the preparation of the proper environmental documents, public notice, and hearing.

3. To ensure the safety of individuals, the Corps is ordered to maintain warning signs at all times and to regularly monitor their existence.

4. I direct that the bridge be returned to its original low-water dimen-

---

98. *Thompson v. Freeman,* 648 F.2d 1144 (8th Cir.1991).

sions.[99] Removal of the bridge is an appropriate remedy under existing authorities. Because there is a possibility that the present structure could be altered or modified during the regulatory process, I stay this portion of my Order pending final approval of the administrative procedures I have ordered, and during an appeal. No other portion of this Order is stayed.

5. The Developers are ordered to provide, to any person considering the purchase of land on the Island, written notice of: (1) pending litigation that may result in return of the bridge to its original structure, or, alteration, relocation, or removal of the existing bridge; and (2) the potential of rapid flooding.

6. Plaintiff, Arkansas Nature Alliance, is entitled to attorneys' fees and costs as allowed by 28 U.S.C. § 2412. Plaintiff is required to submit its petition in compliance with the local rules governing fee applications.

7. The Corps is ordered to file quarterly reports of the actions taken to comply with this Order.

8. All possible administrative procedures available to reasonably expedite this Order should be exercised.

9. All parties should notify this Court within five (5) days from entry of this Order whether additional orders are needed to implement the administrative procedures necessary to carry out this remedy

---

**99.** *Columbia Basin Land Protection Assn. v. Schlesinger,* 643 F.2d 585 (9th Cir.1981). *See* also *Van Abbema v. Fornell,* 807 F.2d 633 (7th Cir.1986).